[No. H021990. Sixth Dist. Sept. 13, 2002.]

THE PEOPLE, Plaintiff and Respondent, v.
WILLIAM RAYMOND DANCY, Defendant and Appellant.

[No. H022703. Sixth Dist. Sept. 13, 2002.]

In re WILLIAM RAYMOND DANCY on Habeas Corpus.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for partial publication. The portions not to be published are sections II.B., II.C., II.D., II.E. and II.F.

**COUNSEL**

Janice M. Brickley, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Eric D. Share, Linda M. Murphy, Ryan McCarroll and Lisa Ashley-Ott, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**MIHARA, J.**—Defendant was convicted by jury trial of two counts of rape of an unconscious person (Pen. Code, § 261, subd. (a)(4)), one count of inflicting corporal injury on a cohabitant (Pen. Code, § 273.5, subd. (a)) and one count of battery with serious bodily injury (Pen. Code, §§ 242, 243, subd. (d)). The jury found true an allegation that he had personally inflicted great bodily injury (Pen. Code, § 12022.7, subd. (d)) in the commission of the inflicting corporal injury and battery counts. The court found true allegations that defendant had suffered two prior serious felony convictions (Pen. Code, §§ 667, subds. (a), (b)-(i), 1170.12) and served prison terms for three prior felony convictions (Pen. Code, § 667.5, subd. (b)). Defendant was committed to state prison to serve an indeterminate term of 75 years to life consecutive to a determinate term of 14 years.

On appeal, he claims that the trial court prejudicially erred in (1) failing to instruct on consent in relation to the intent element of rape of an unconscious person, (2) permitting the prosecution to introduce evidence under Evidence Code section 1108 and giving a defective limiting instruction on the Evidence Code section 1108 evidence, (3) admitting a tape recording of a phone conversation between the prosecutor's investigator and a victim of defendant's 1985 assault conviction and (4) giving CALJIC No. 17.41.1. Defendant also claims, both in his appeal and in an accompanying petition for a writ of habeas corpus, that his trial counsel was prejudicially deficient in failing to object to the admission of letters written by the victim of his current offenses. In the published portion of our opinion, we reject defendant's challenge to the instructions on the elements of and defenses to rape of an unconscious person. We reject his other contentions, affirm the judgment and summarily deny his petition.

### I. Factual and Procedural Background

Defendant was released from prison on parole on January 1, 1997. He had been serving time for a narcotics conviction.[1] Ilka A. met defendant in January 1997. Ilka was working for the Emergency Housing Consortium

---

[1] He had been initially paroled in October 1996, but his parole was almost immediately revoked and he was returned to custody.

(EHC) at its downtown San Jose homeless shelter, and defendant was first living and then volunteering there. Defendant told Ilka that he had been incarcerated for a drug offense, but he did not tell her that he had been convicted of any sex offenses. Although defendant was at least a decade younger than her (Ilka was in her mid-50's), Ilka fell in love with defendant, and they began having sex together. In mid-February 1997, defendant moved into Ilka's residence. They apparently agreed that it was okay for defendant to have sexual relations with other women so long as he was discreet. Ilka frequently awakened in the morning to find defendant having sex with her, and she found this acceptable though they never discussed the matter.

A month or two after defendant moved in with Ilka, they both stopped working for EHC, and Ilka went to work at The Home Depot. Their relationship was troubled and marked by frequent arguments, but the only physical violence occurred during one incident when defendant bit Ilka's cheek and spit in her face during an argument. In May 1997, defendant briefly moved out and then moved back in again. In July 1997, defendant again left Ilka's residence. After he left, Ilka contacted defendant's parole agent, James Clem, because she suspected that defendant was using drugs and thought Clem could help him. She told Clem where she believed defendant could be found. Clem found defendant and confirmed that he was using drugs. Defendant was arrested and returned to prison for violating his parole by using drugs. Defendant was released from prison in early September 1997, and he moved back in with Ilka. Their sexual relationship resumed. In late November 1997, EHC opened a new San Jose facility, and both Ilka and defendant went to work there. Ilka consistently worked a graveyard shift at the EHC facility that started at midnight, while defendant worked various shifts there as a "floating" shift supervisor. They worked the same shift about twice a week. Ilka kept her Home Depot job until late December. Ilka and defendant had bought a car, and she was angry at times that he gave other people rides to and from work but did not always drive her to and from work.

In early December 1997, defendant asked Ilka to marry him, and she accepted his proposal. However, about the same time, Ilka noticed that defendant had begun to have "a lot of mood swings." He refused to talk about his irritability, and he became verbally abusive. Their arguments became even more frequent, and defendant started calling her "a bitch."[2] Ilka suspected that defendant was "sneaking out" while she was asleep. One night Ilka spent the night in a motel because she did not want to deal with defendant. In mid-December 1997, defendant told their boss that he and Ilka

---

[2]Defendant testified at trial that he had been jealous because he believed that Ilka was seeing other men.

were having a relationship and "they were not getting along." Their boss told defendant that there was a company policy that "significant others" were not allowed to supervise each other. The matter was apparently not further pursued. About the same time, Ilka told her supervisor that she and defendant had been arguing a lot and that defendant was a "jerk."

On Sunday, December 28, both defendant and Ilka were working the graveyard shift. Usually three or four EHC employees worked a night shift. One duty performed by EHC employees was nighttime perimeter checks, and these checks were usually performed by male employees. About 1:20 a.m., defendant contacted Ilka by radio and asked her to go out with him to do a perimeter check. Another employee came to relieve her from her post, and she went outside with defendant. Once they were outside, defendant offered her a cigarette, and she took one. The last thing she remembered that night was waiting for defendant to light her cigarette.

When she regained consciousness, she was in her residence in "agonizing pain." It appeared to be mid-morning. One of her eyes was swollen shut, and the other eye was "like a little slit." She could barely see. Her head and mouth hurt, her gums were bleeding and her lips were swollen. She had difficulty speaking or swallowing. Her inability to speak was due in part to the absence of her dentures. Defendant was with her, and she asked him what had happened. He told her that she had slipped, fallen and hit some cement stairs. Defendant said he had thought she was dead. He claimed that he had gotten someone to assist him with her, and he had told their boss about the incident. This was a lie, as he had not told their boss or anyone else anything about the incident. Instead, defendant had told Ilka's supervisor that Ilka had quit.

Defendant gave Ilka some Nyquil[3] and some Tylenol, and he told her that the Nyquil would help her. Ilka lost consciousness or fell asleep. She was vaguely aware of being placed in a car. When she awoke again, she was naked in a bed alone in a cold motel room with the television on.[4] She lost consciousness or fell asleep again. The next time she woke up defendant was with her. He fed her some soup and some water. Ilka drifted in and out of consciousness. Each time she awoke, defendant gave her another swallow of

---

[3]Nyquil contains both alcohol and an antihistamine. An entire bottle of Nyquil contains approximately the alcohol in one drink. However, the amount of antihistamine in a bottle of Nyquil is potentially toxic and could induce a coma.

[4]As the motel's records indicated that defendant checked in on December 31, 1997, Ilka apparently spent two days at her residence (December 29 and 30) before defendant brought her to the motel room.

Nyquil.[5] He also fed her more soup and water. Ilka asked defendant to take her to the hospital, but he did not do so. At one point, she woke up and defendant told her it was New Year's Eve. He gave her some champagne, and they wished each other a happy new year. At another point she woke up to find defendant putting ice bags on her face.

Twice during her stay in the motel room, she woke up to find defendant having sexual intercourse with her. He was on top of her with his penis in her vagina, and his movements were causing her pain even though he was not being rough. She repeatedly tried to tell him to "stop" because she "didn't want sex," but defendant did not stop and said something like "you can handle it" or "you can hang" and "[i]t will be all right." On both occasions, he continued his activities until he had ejaculated.

On Saturday, January 3, 1998, defendant told her that he was going to work.[6] Ilka woke up the next morning and felt a little better. She wanted to leave the motel, go home and see a doctor. She tried to telephone someone to help her go home, but she could not remember her son's telephone number. She telephoned the EHC facility where she and defendant worked, but defendant was not there. Ilka left the motel room and managed to find her way home even though she was wearing neither shoes nor socks and was about a mile and a half to two miles from her home. On her way home, she saw defendant's car parked near her residence.

She reached her residence and found it locked. Ilka heard voices inside and knocked, but no one answered the door. Because she desperately needed to use the bathroom, she broke one of the windows and crawled into her residence. The bathroom door was closed, and a female voice responded to her attempts to open the door by refusing to let her in. Suddenly the bathroom door opened and a fellow EHC employee named Carolyn Valentine, with whom Ilka was barely acquainted, came out. Ilka used the bathroom. When she came out, Valentine was still there. Ilka became very upset, called Valentine "a few names" and "told her to get the hell away from my place." She thought defendant and Valentine had been having sex together. Ilka continued to yell at Valentine as Valentine left the residence and walked out of sight. Ilka then found defendant in the kitchen and began yelling at him. Ilka's microwave oven was missing from the kitchen. Still furious, she found Valentine's coat on the floor and tried to damage it. Defendant took the coat and left.

Defendant picked up Valentine and drove her to the motel room. On the way, Valentine asked defendant how Ilka had been injured, and defendant

[5]Most people would not be "knocked out" by a dose of Nyquil.
[6]He did not actually go to work, and he was terminated for failing to show up.

said she had hit her head on the dashboard of the car when he made a sudden stop. Valentine did not believe him because his explanation seemed to her to be inconsistent with Ilka's injuries and the car was not damaged. After they arrived at the motel room, defendant left for a while and then returned.

Ilka went to the grocery store to get some aspirin. She left her door unlocked. When she returned, the door was locked. She crawled back in through the window and found no one inside. However, her microwave oven was now in the middle of the living room floor. Ilka looked in the mirror and was shocked. She did not believe that her injuries could have been from a fall and suspected she had been assaulted. Ilka called 911, and the police responded. At this point, it was 1:30 p.m. on January 4. The police accompanied her back to the motel. When the police officers knocked on the motel room door and announced themselves, defendant climbed out the bathroom window and fled.

Ilka asked the police officers to take her to the hospital. It was determined by the doctors at the hospital that Ilka had a "closed-head" injury, multiple severe facial fractures and injuries to her neck that appeared to have resulted from manual strangulation.[7] She still had difficulty speaking and swallowing. When a police officer asked her if she had had sex with defendant, she said "Honey, I hurt so much all over, I couldn't even begin to tell you." Ilka was hospitalized for three or four days. After her release from the hospital, she was very fearful and suffered from panic attacks. At times Ilka thought that defendant had tried to kill her. She stayed at a shelter for battered women for about a month before she was ready to go home. Ilka told a shelter employee that her boyfriend had beaten her up. A couple of days after she went to stay at the shelter, she spoke by telephone to Sergeant Steve Papenfuhs, the detective assigned to the case. This conversation was tape-recorded. Papenfuhs was the first person she told about the incidents of sexual intercourse in the motel room. Papenfuhs informed Ilka that defendant had been "in trouble" twice before including both a prior sex offense and a prior violent offense. Ilka was initially anxious for defendant to be found by the police both because she was fearful and because she wanted "some explanation."

In early 1998, Ilka sent several letters to Papenfuhs suggesting where defendant might be found and intimating that defendant had been having affairs with other EHC employees. Ilka never asked Papenfuhs to drop the case. In May 1998, Ilka notified Papenfuhs that a man named Larry Wilson had indicated that he had witnessed defendant assaulting Ilka. Ilka had told Wilson that she would "reward" anyone who had witnessed the incident and

---

[7]There was no alcohol in her blood at 3:15 p.m. on January 4.

came forward. Wilson later admitted that he had fabricated his story because he felt sorry for Ilka, "loved her" and "wanted her."

Defendant was arrested in Arizona in October 1998. He was charged by information with three counts of rape of an unconscious person (Pen. Code, § 261, subd. (a)(4)), three counts of rape of an intoxicated person (Pen. Code, § 261, subd. (a)(3)), one count of inflicting corporal injury on a cohabitant (Pen. Code, § 273.5, subd. (a)) and one count of battery with serious bodily injury (Pen. Code, §§ 242, 243, subd. (d)). It was further alleged that he had personally inflicted great bodily injury (Pen. Code, § 12022.7, subd. (d)) in the commission of the inflicting corporal injury and battery counts and that he had suffered two prior serious felony convictions (Pen. Code, §§ 667, subds. (a), (b)-(i), 1170.12) and served prison terms for three prior felony convictions (Pen. Code, § 667.5, subd. (b)).[8]

Defendant wrote a letter to Ilka from jail, and in October 1999, shortly before the preliminary examination, she began visiting him twice a week in jail despite the fact that defendant had been ordered to have no contact with her. Ilka tried to convince the prosecutor to drop the charges against defendant. She did not want to be in court, wanted to get on with her life and could not "remember exactly a hundred percent what had happened."[9] She was also irritated that some police officers had come to her residence looking for defendant prior to his arrest. Ilka had concluded that defendant had not raped her in the motel room because the sex acts were consistent with their habitual practices, and she believed defendant could not understand her attempts to tell him to stop. "I would have never said no, had it not been for the pain in my head. . . . I like to have sex with him. I would have never said no, but my head was killing me, and I truly believe he might not have understood my speech at that time. I really didn't have much of any kind of speech." She also felt that defendant had not assaulted her because he would not "put me in any harm's way."

Ilka testified at trial that she loved defendant and did not believe that he had assaulted her or raped her. A tape of Ilka's initial conversation with Papenfuhs was played for the jury over defense objections. Expert testimony established that Ilka's injuries were inconsistent with a fall or a car accident because the areas of her face that were most prominent, such as her nose, were not injured. The absence of skin trauma reflected that a soft object such as a fist had caused the injuries. The marks on her neck were indicative of

[8]The prior conviction and prison prior allegations were bifurcated at defendant's request, and defendant subsequently waived his right to a jury trial on those allegations.

[9]Yet at the same time Ilka filed a lawsuit against EHC and sought workers' compensation benefits for the injuries she suffered on December 29, 1997 at the EHC facility.

manual strangulation. The nature of the injuries demonstrated that they had been inflicted by another person. Both of her cheekbones were fractured indicating that there had been blows to both sides of her face. An expert testified that amnesia was common after a blow to the head, and frequently the recipient of such a blow could not remember the event that led to the injury. Evidence was received at trial under Evidence Code section 1108 that defendant had committed attempted rape in 1978 and a sexually motivated assault in 1985. The victim of the 1978 attempted rape testified, and a transcript of the former testimony of the victim of the 1985 assault was read to the jury. A tape of a February 2000 conversation between the victim of the 1985 assault and the prosecutor's investigator that mentioned a 1984 sodomy offense was also played for the jury, though it was not admitted for its truth.

Defendant testified on his own behalf at trial. He denied that he had made any physical contact with Ilka at the time she suffered her injuries. He testified that he had lit his cigarette, and the next thing he knew she was rolling around on the ground choking or gagging. He claimed that he took her dentures out because she seemed to be choking on them. Defendant testified that Ilka was conscious and refused to let him call an ambulance. She insisted on being taken home, and he took her home even though he could tell she was seriously injured. Defendant testified that he asked another shift supervisor to cover for him, and he signed himself and Ilka out on their time sheets before they left the EHC facility. At home, he put her to bed, and then he returned to the EHC facility. He later gave Ilka Nyquil and Tylenol in hopes of relieving her pain. Defendant testified that he had no difficulty understanding what Ilka said after she was injured. He testified that he had not raped Ilka, and he professed no actual memory of whether they had had sex in the motel room. Defendant testified that he "probably" had sex with Ilka in the motel room "I guess," but he insisted that he could not remember. He confirmed Ilka's testimony about their habit of him waking her up by having sex with her.

Defendant admitted that he had been in prison three times and that the victim of his 1978 offense had testified truthfully. His only explanation for the 1978 offense was that he "was young and stupid" and "[i]t was [an] impulse thing." Defendant disclaimed any improprieties with the victim of the 1985 assault. He asserted that he had believed that she had consented to have anal sex with him in 1984. Defendant accused the victim of the 1985 offense of trying to blackmail him into paying her money in exchange for her retraction of her claim that he had sodomized her in 1984. Nevertheless, defendant claimed that he had continued his sexual relationship with her after the 1984 incident until he was arrested for the 1985 incident. He testified that her injuries in 1985 had been caused by her accidentally falling

from a bed. Defendant contended that she had lied both about the 1984 anal sex and the 1985 assault. Defendant admitted his prior convictions and conceded that he had lied about them when he applied for the EHC job by stating that he had never been convicted of a felony.[10]

The prosecutor argued to the jury that Ilka had "minimized the events" in her testimony because she "loves the guy" and could not "accept" that he had done these things to her. She asked the jury to "reject" Ilka's testimony and "look at her prior statements . . . ." Defendant's trial counsel argued to the jury that Ilka's prior statements should be disbelieved because they were made when she was "very, very angry" with defendant and jealous because she believed that he had been cheating on her while she was in the motel room recovering from her injuries.

The jury deliberated for about two and one-half hours before reaching its verdicts. It found defendant guilty of two of the three rape of an unconscious person counts, the inflicting corporal injury count, and the battery count. The jury found true the allegation that defendant had personally inflicted great bodily injury in the commission of the inflicting corporal injury and battery counts. The jury acquitted defendant of the three rape of an intoxicated person counts and of the third rape of an unconscious person count. After a court trial on the prior conviction and prison prior allegations, the court found those allegations true. Defendant was committed to state prison to serve an indeterminate term of 75 years to life consecutive to a determinate term of 14 years. He filed a timely notice of appeal.

## II. *Discussion*

### A. *Instructions on Rape of an Unconscious Person Counts*

Defendant claims that the trial court erred in failing to instruct the jury on consent and reasonable belief in consent in connection with the intent element of rape of an unconscious person.

#### 1. *Background*

The defense requested numerous instructions regarding the rape counts. One requested instruction was CALJIC No. 10.61.1. This instruction read: "Evidence has been introduced for the purpose of showing that the defendant

---

[10]He also testified that he was a "three-striker, you know." The court admonished him not to volunteer information.

and alleged victim engaged consensually in sexual intercourse on one or more occasions prior to the charge against the defendant in this case. [¶] If you believe this evidence, you should consider it only for the limited purpose of tending to show that the alleged victim consented to the acts of intercourse charged in this case, or that the defendant had a good faith reasonable belief that the alleged victim consented to the act of sexual intercourse. [¶] You may not consider that evidence for any other purpose." The court refused to give this instruction on the ground that it was not relevant.[11]

Defendant also requested that the jury be instructed pursuant to CALJIC No. 10.65 on reasonable good faith belief in consent. The court gave a modified version of this instruction that limited it to the rape of an intoxicated person counts. The defense requested an instruction on "advance" consent and reasonable belief in "advance" consent, but the trial court denied the request after the prosecution argued that consent was not an element of rape of an unconscious person. The court stated: "[T]here really is no evidence of consent in advance to have sex while a person's all banged up, semiconscious, not conscious at all, head swollen, skull fractured in 12 places and so forth. I don't think there was any evidence that supported a statement or position by the victim that I'm giving you permission to have sex with me in advance, if that happened."

The defense requested a modified version of CALJIC No. 1.23.1 on consent. The court gave the requested modified instruction except that it limited the instruction to "prosecutions under Penal Code section[] 261(a)(3)" rather than permitting it to be applied also to the rape of an unconscious person counts. Defendant also asked that the jury be instructed that "[i]f, however, you find that the alleged victim [of rape of an unconscious person] would have consented to the sexual act but for her state of unconsciousness or sleep, then you must find the defendant not guilty." The trial court refused to give this instruction. The court also declined defendant's request that the jury be instructed that "[i]f, however, you find that the alleged victim would have consented to the sexual act but for her state of unconsciousness or sleep, then the alleged victim's inability to resist has not been shown to be relevant and you must find the defendant not guilty."

The trial court's actual instructions to the jury included a reading of the information. The rape of an unconscious person counts charged that defendant "did accomplish an act of sexual intercourse with Ilka A[.], a person not

---

[11]During in limine motions, the defense filed a motion seeking admission of prior sexual conduct of Ilka under Evidence Code section 782.

the spouse of said defendant, where said person was at the time unconscious of the nature of the act and this was known to the defendant." The court then gave more detailed instructions on these counts. "Every person who engages in an act of sexual intercourse with another person not the spouse of the perpetrator, who is at the time unconscious of the nature of the act, and this condition is known to the accused, is guilty of the crime of rape . . . . [¶] Unconscious of the nature of the act means the alleged victim was incapable of resisting because she was, A, unconscious or asleep, or B, not aware, knowing, perceiving or cognizant that the act occurred. [¶] In order to prove this crime, each of the following elements must be proved: One, a male and female engaged in the act of sexual intercourse; two, the two persons were not married to each other at the time of the act of sexual intercourse; three, the alleged victim was at the time unconscious of the nature of the act; and four, this unconsciousness was known to the accused."

The prosecutor argued to the jury that these counts were "general-intent crime[s]." "Ignorance of the law is no excuse. No specific intent to rape is required here. The elements are that you engaged in an act of sexual intercourse with your nonspouse. The victim was unconscious of the nature of the act, and that condition was known to the defendant. Force or fear is not required. We don't have a predatory type rape here. Don't have to show that she was fearful or there was force used . . . ." "I have to prove to you . . . that this condition was known to the defendant. Well, that's their common practice and habit. The defense may try to argue that their prior habit are [sic] dispositive of this crime, but as you can see, lack of consent in this crime is not an element that the prosecution has to prove, doesn't come into play in this section, nor is proof of consent an affirmative defense. [¶] But even if it were, remember the victim said this happened three times after she was beat up, and each time she asked him to stop. She begged him to stop, . . . but . . . he did it two more times, so the condition was known to him."

Defendant's trial counsel conceded in his argument to the jury that the rape of an unconscious person counts were "the most troublesome count[s] that you're gonna be faced with." He asserted that the phrase "incapable of resisting" in the instruction "assumes that if she had [not] been incapable of resisting, she would have resisted." "And I think the incapable of resisting language here tells you that it's not rape if the person wouldn't have resisted because the language certainly says you can't have sex with sleeping people, and that's perfectly understandable in some contexts." He claimed that the jury could not convict defendant of these counts unless it found that Ilka "would have resisted" if she had not been unconscious.

## 2. *Analysis*

Defendant claims that the trial court prejudicially erred "by failing to instruct on consent as it relates to the general intent requirement of rape of an unconscious person, and in refusing to permit the jury to consider the couple's past sexual practices in relation to that offense."

"Rape is an act of sexual intercourse accomplished with a person not the spouse of the perpetrator, under any of the following circumstances: [¶] . . . [¶] . . . Where a person is at the time unconscious of the nature of the act, and this is known to the accused. As used in this paragraph, 'unconscious of the nature of the act' means incapable of resisting because the victim meets one of the following conditions: [¶] (A) Was unconscious or asleep. [¶] (B) Was not aware, knowing, perceiving, or cognizant that the act occurred. [¶] (C) Was not aware, knowing, perceiving, or cognizant of the essential characteristics of the act due to the perpetrator's fraud in fact." (Pen. Code, § 261, subd. (a)(4).) ▮▮▮ Since rape is a general intent crime (*People v. Osband* (1996) 13 Cal.4th 622, 685 [55 Cal.Rptr.2d 26, 919 P.2d 640]), the requisite criminal intent is the intent to do the prohibited act. (*People v. Daniels* (1975) 14 Cal.3d 857, 860 [122 Cal.Rptr. 872, 537 P.2d 1232].) Hence, a person who intentionally has sexual intercourse with an unconscious victim knowing that the victim is unconscious commits rape of an unconscious person.

Although lack of consent is not a statutory element of rape of an unconscious person, defendant asserts that the statutory language necessarily implies the existence of a lack of consent element. Alternatively, he claims that the need for a criminal intent requirement requires the addition of a lack of consent element to prevent the crime from being a strict liability offense. Finally, he argues that the trial court erred in failing to instruct the jury that consent or a belief in consent negates general criminal intent. We reject his contentions.

▮▮▮ Penal Code section 261, subdivision (a) contains numerous subdivisions defining several different types of rape. Some of these subdivisions contain a lack of consent element; others do not. The subdivision describing rape of an unconscious person does not contain a lack of consent element. "When the Legislature has used a term or phrase in one part of a statute but excluded it from another, courts do not imply the missing term or phrase in the part of that statute from which the Legislature has excluded it." (*People v. Gardeley* (1996) 14 Cal.4th 605, 621-622 [59 Cal.Rptr.2d 356, 927 P.2d 713]; see also *Zavala v. Board of Trustees* (1993) 16 Cal.App.4th 1755, 1762

[20 Cal.Rptr.2d 768].) By including a lack of consent element in the subdivisions setting forth the elements of several types of rape but not including a lack of consent element in the subdivision setting forth the elements of rape of an unconscious person, the Legislature obviously made an explicit choice not to require proof of lack of consent where the victim was unconscious at the time of the act of sexual intercourse.

■ Defendant seizes on the phrase "incapable of resisting" in the description of the "unconscious of the nature of the act" element of rape of an unconscious person and urges that these words suggest a requirement that there be proof that the victim *would have resisted if he or she had been conscious.* He theorizes that the prosecution must prove a hypothetical fact: what the unconscious victim *would have done* if conscious. The words of the statute do not support this strained reasoning. The statute uses the words "incapable of resisting" to describe the victim's *actual* lack of *awareness* of the act rather than in reference to the victim's *hypothetical lack of consent* to the act. Had the Legislature actually intended to require proof of the victim's actual or hypothetical lack of consent as an element of rape of an unconscious person, it would have been simple for the Legislature to include a lack of consent element as it did in other subdivisions of Penal Code section 261. Its failure to do so is indicative of its decision that sexual intercourse with an unconscious person is a criminal sexual offense regardless of real or hypothetical consent.

■ We also reject defendant's claim that a lack of consent element must be added to the statutory elements to preclude the crime from being a strict liability offense. ■ "Generally, ' "[t]he existence of a mens rea is the rule of, rather than the exception to, the principles of Anglo-American criminal jurisprudence." . . .' . . . In other words, there must be a union of act and wrongful intent, or criminal negligence. . . . 'So basic is this requirement that it is an invariable element of every crime unless excluded expressly or by necessary implication.' . . . In addition, Penal Code section 26 provides that a person is incapable of committing a crime where an act is performed in ignorance or mistake of fact negating criminal intent; a crime cannot be committed by mere misfortune or accident." (*People v. Coria* (1999) 21 Cal.4th 868, 876 [89 Cal.Rptr.2d 650, 985 P.2d 970], citations omitted.) "Generally speaking, a strict liability offense is one which dispenses with a mens rea, scienter, or wrongful intent element." (*People v. Sargent* (1999) 19 Cal.4th 1206, 1223 [81 Cal.Rptr.2d 835, 970 P.2d 409].) "Strict liability offenses eliminate the 'requirement of mens rea; that is, the requirement of a "guilty mind" with respect to an element of a crime.' . . . As such, a defendant may be guilty of a strict liability offense even if he does not know 'the facts that make his conduct fit the definition of the

offense.' " (*People v. Rubalcava* (2000) 23 Cal.4th 322, 331 [96 Cal.Rptr.2d 735, 1 P.3d 52], citation and italics omitted.)

 It is well accepted that rape requires proof of a general criminal intent. (*People v. Osband, supra,* 13 Cal.4th at p. 685.) General criminal intent is simply the intent to do the prohibited act. The act prohibited by Penal Code section 261, subdivision (a)(4) is the act of sexual intercourse with an unconscious person. The statute also contains an explicit mental state requirement that precludes conviction without proof that the perpetrator knew of the victim's unconsciousness. The requisite general criminal intent is simply the intent to have sexual intercourse with an unconscious victim.

Defendant argues that criminal intent does not exist if the unconscious victim consented in advance or the defendant reasonably believed that the victim would have consented or would not have resisted if conscious. In defendant's view, a defendant who did not intend to prevent his unconscious victim from resisting "but to engage in a mutually consensual sexual practice" lacks any "wrongful" or "criminal intent." At its core, defendant's contention is that a man who intentionally engages in sexual intercourse with an unconscious woman, knowing that she is unconscious, does not harbor general criminal intent—a *wrongful* intent—if he reasonably believes that the woman has consented in advance or would have consented if she had been conscious.[12] His argument assumes that a perpetrator's intent to have sex with an unconscious person is not in and of itself wrongful regardless of the perpetrator's belief that the unconscious person has given "advance consent" or would have consented if conscious. This assumption is erroneous.

Unlike a man who engages in an act of sexual intercourse with a conscious woman under the reasonable but mistaken impression that the woman consents (*People v. Mayberry* (1975) 15 Cal.3d 143 [125 Cal.Rptr. 745, 542 P.2d 1337]) or a man who engages in sex with a conscious minor under the reasonable but mistaken impression that the minor is an adult (*People v. Hernandez* (1964) 61 Cal.2d 529 [39 Cal.Rptr. 361, 393 P.2d 673, 8 A.L.R.3d 1092]), a man who intentionally engages in sexual intercourse with a woman he knows to be unconscious is clearly aware that he is wrongfully depriving the woman of her right to withhold her consent to the act at the time of penetration. Since a woman may withdraw her consent to a sex act

---

[12]We recognize that the statute applies equally to both male and female perpetrators and male and female victims, and we do not mean to imply that our analysis is not equally applicable to both genders. However, we have yet to encounter any cases in which a female perpetrator has had sexual intercourse with an unconscious male victim.

even after the initiation of sexual intercourse[13] (*People v. Roundtree* (2000) 77 Cal.App.4th 846, 851 [91 Cal.Rptr.2d 921]), neither a woman's actual "advance consent" nor a man's belief in "advance consent" could possibly eliminate the wrongfulness of the man's conduct in knowingly depriving the woman of her freedom of choice both at the initiation of and during sexual intercourse. Consequently, a person who commits the prohibited act necessarily acts with a "wrongful" intent. ▉ Thus, rape of an unconscious person is not a strict liability offense because it has not just one but two separate mens rea requirements. A defendant may be convicted of rape of an unconscious person only if he had both knowledge of the person's unconsciousness and the wrongful intent to engage in an act of sexual intercourse with an unconscious person.

▉ Defendant also argues that the trial court erred in failing to instruct the jury that the general intent to commit the prohibited act may be negated by the victim's "advance consent" or the perpetrator's belief that the victim has consented in advance to the prohibited act. The court did not err. The concept of an "advance consent" to unconscious sexual intercourse is based on a fallacy. A decision to engage in sexual intercourse is necessarily an ad hoc decision made at a particular time with respect to a particular act. While a woman may expressly or impliedly consent to *conscious* sexual intercourse in advance, she remains free to withdraw that consent, and ordinarily has the ability to do so since she is conscious. Even if a woman expressly or impliedly indicates in advance that she is willing to engage in *unconscious* sexual intercourse, a man who thereafter has sexual intercourse with her while she is unconscious necessarily deprives her of the opportunity to indicate her lack of consent. The inherent risk that a man may misinterpret a woman's prior statements or conduct weighs strongly against recognizing "advance consent" as a defense to rape of an unconscious person since the woman's lack of consciousness absolutely precludes her from making her lack of consent known at the time of the act. It follows that a man who intentionally engages in sexual intercourse with a woman he knows to be unconscious harbors a "wrongful" intent regardless of whether he believes that she has (or she actually has) consented in advance to the act. The trial court did not err in failing to instruct the jury that it was a defense to rape of an unconscious person that defendant believed that Ilka had consented in advance, would have consented if conscious or would not have resisted if conscious.

---

[13]The issue of whether the crime of rape occurs when a woman withdraws consent during a sex act but the man completes the act after the withdrawal of consent is currently pending before the California Supreme Court in *In re John Z.* (2001) 94 Cal.App.4th 33 [114 Cal.Rptr.2d 89], review granted February 20, 2002, S103427.

B.-F.*

. . . . . . . . . . . . . . . . . . . . . . . . . .

### III. *Disposition*

The judgment is affirmed. The petition is summarily denied.

Bamattre-Manoukian, Acting P. J., and Rushing, J., concurred.

Appellant's petition for review by the Supreme Court was denied November 26, 2002.

---

*See footnote, *ante*, page 21.