Filed 4/11/22  P. v. Paniague CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br>v.<br>RAMON PENA PANIAGUE,<br>    Defendant and Appellant. | A164263<br><br>(Fresno County<br>Super. Ct. No. F19906503) |

Ramon Pena Paniague was convicted of felony oral copulation of an unconscious person and misdemeanor sexual battery after he entered his sleeping 19-year-old stepdaughter's bedroom and sexually assaulted her.  He contends the trial court erred when it failed to instruct the jury on mistake of fact as to the oral copulation count, as to Paniague's good character for appropriate sexual behavior, and on attempted oral copulation of an unconscious person as a lesser offense of the oral copulation count.  His contentions are meritless, so we affirm.

## BACKGROUND

Paniague and Rosario P. moved in together in 2012 or 2013 and married in 2014.  Rosario had four children from prior relationships: Estrella,

Brisa, Jesus, and Josue.[1]  She later had another daughter with Paniague.  Estrella, the oldest, was about 12 years old when Paniague started living with the family.

Estrella described her relationship with Paniague as "good" and "respectful" but not close.  They argued on rare occasions, but Paniague was never verbally abusive toward her.

In November 2017, when Estrella was 19, she and her siblings lived in a three-bedroom house with Paniague, Rosario, her grandmother, and her uncle Ignacio P.[2]  According to Estrella, the two youngest children slept in a bedroom at the back of the house with Rosario and Paniague; Brisa and Jesus would sometimes sleep in Ignacio's bedroom and sometimes in the living room.  Estrella usually slept separately in a bedroom at the front of the house, but Jesus kept his belongings in that room and sometimes also slept there.  Estrella's bedroom had bunk beds; Estrella slept on the bottom bunk.  To get into her bed, she would have to duck down to avoid the rails from the top.

On November 10, 2017, Paniague started drinking beer at work around 10:00 a.m.  He and Rosario returned home from work around 3:00 p.m.  At some point that afternoon Paniague went with Estrella, Brisa, and their cousin Angel to a liquor store to buy more beer, but otherwise he stayed outside by himself drinking until around 7:30 p.m.

Rosario went to bed with the two youngest children around 8:30 p.m.  Estrella, Angel, Jesus, and Brisa were playing Monopoly in the living room.

---

[1] We will refer to the family members by their first names to preserve their confidentiality and avoid confusion.  We intend no disrespect.

[2] Estrella's grandmother was away when the relevant events occurred.

2

Paniague joined them around 9:00 or 10:00. He appeared to be intoxicated and was "getting to the overly intoxicated" point.

Estrella's boyfriend, Antonio, came by the house at 11:00 p.m., after he finished work. Estrella was not allowed to have men in the house at night, so she met him in the front yard; they talked and had sex in his car. Estrella stayed with Antonio until she went inside the house around 2:00 a.m. Estrella got in bed but stayed awake for a while. At some point her brother Jesus came into her room and asked if she wanted him to turn off her light. She did, so he turned off the bedroom and hallway lights and left Estrella's door slightly open.

Estrella was wearing long pajama pants, underwear, and a tank top and was under a sheet and blanket. She is a deep sleeper and has to set multiple alarms to get herself up in the morning. Around 3:00 a.m. Estrella woke up to feel "a large presence over me," with its weight on her body. She explained at trial, "I feel like I was in and out of sleep a lot during that time. I'm not sure if it was my mind trying to protect me. But eventually, I did wake up fully, um, when I heard a slight noise that was like outside of the room" and felt a person, like a heavy weight, on top of her, and the person's hands and mouth on her breast. Estrella saw a dark figure and automatically assumed it was her boyfriend Antonio. She pushed him, and he moved to the end of the bed.

The noise Estrella had heard from outside the room turned out to be her mother, who was looking for Paniague. Rosario had woken up around 3:00 a.m. and discovered Paniague was not in bed with her, so she went looking for him. She turned on the kitchen light and searched inside and outside of the house without finding him. Estrella's door was open, and there

3

was enough light from the kitchen to see into her room a little bit. Estrella was in bed; Rosario did not see anyone else in the room.

From her bed, Estrella saw Rosario peeking out of the front door[3] and then briefly felt her standing nearby but did not move or speak because she still thought Antonio was in her room and did not want to get in trouble. Once Rosario moved away Estrella started to realize the person in her bedroom could not be Antonio, who could not have gotten past the family's dogs. She then checked her phone and saw that Antonio had texted her "good night and whatnot."

Estrella pointed the light from her phone at the intruder and saw it was Paniague on his knees on the floor by the head of her bed. Shocked, Estrella told him to get out. Paniague asked, "Estrella, are you sure?" She responded, "I need you to get out now." Paniague stood up and left.

Estrella's tank top was pulled halfway down her breasts. Her pajama pants and underwear were pulled down to below her knees. She thought she had been raped because her clothes were off, and she "could feel something had been like inside" of her, probably a penis. She felt wet inside and outside of her vagina.

Rosario had by then returned to her own bedroom. She called Paniague's phone and heard it ring in the kitchen. She went to look for it and saw Paniague emerging from Estrella's bedroom. Rosario asked Paniague what he was doing there. He said he did not know.

Estrella phoned Antonio but was unable to reach him. She then called her maternal aunt, Ana, who lived a few minutes away. Estrella was crying so hard she had difficulty getting the words out, but eventually she told her

---

[3] The door to Estrella's bedroom was now fully open.

aunt Paniague had raped her. Ana said she was coming over and that she was going to call Ignacio.

When Ignacio got Ana's call, he got up and found Estrella distraught, crying, and hyperventilating. She said Paniague had raped her. Rosario came in and asked Estrella why Paniague had been in her room. Estrella told her he had come into her room and touched her. Ignacio called the police.

Rosario confronted Paniague and asked if what Estrella said was true. Paniague was very drunk. He said it was true and that "he made a mistake with the rooms" and thought Estrella was Rosario. Rosario told him he could not have made that mistake because their bedroom was on the opposite side of the house. She could not believe what had happened. She pushed Paniague and told him to leave. Police arrested Paniague shortly before 4:00 a.m., less than half a mile from the house. He smelled mildly of alcohol but showed no obvious signs of intoxication.

Estrella gave a police statement and around 8:30 a.m. underwent a sexual assault examination. Swabs were taken from her lips, neck, and vagina. The swab from her lips contained a mixture of three or more people and was not suitable for comparison. The swab from her neck contained a mixture of two or more people; the major profile belonged to Paniague, and the minor profile belonged to Antonio. The vaginal swabs were consistent with a mixture of Estrella and Antonio. A penile swab from Paniague contained DNA that was not consistent with Estrella or Antonio, while other swabs contained only DNA from Paniague and an uninterpretable minor donor.

Detectives interviewed Paniague around 6:00 a.m. on November 11. A video recording of the interview was played for the jury. Paniague said he

5

had three beers the previous day to relax and, after initially denying drug use, said a friend had given him some powder, perhaps "crystal," which he used that afternoon. Rosario and Ignacio were already in bed when he went inside and joined the children around 8:00 p.m.

Paniague eventually fell asleep on a couch. When he woke up sometime after 10:00 everything was dark. Paniague got confused and "made a mistake." Instead of going into his and Rosario's room, he went into Estrella's room, lay down on the bed with her and, thinking she was Rosario, kissed her on the mouth. "And then [he] remembered . . . she wasn't my wife. And [he] told her [he was] sorry."

Paniague initially denied doing anything else, but, after the detectives said they had collected his DNA from Estrella, he admitted he had taken her clothes off and kissed her vagina and breasts. Asked whether Estrella was asleep or awake, Paniague first said she was asleep, then that he didn't know, then that she "was awake" or that she "woke up," then that "[s]he was asleep." He said Estrella helped him remove her clothing, kissed him back and said she liked it when he kissed her vagina, but he thought that she believed he was someone else. He repeatedly denied having intercourse with her. Paniague thought he was in his own room with Rosario until Estrella called him by Antonio's name; at that point he realized she was not his wife. He admitted that Estrella was asleep when he kissed her vagina and breasts.

Defense counsel argued to the jury that the limited DNA evidence failed to prove the charged offenses; that Estrella was not asleep, but, rather, did not resist because she thought Paniague was Antonio; that Paniague thought Estrella was Rosario; and that he did not restrain her.

6

The jury found Paniague guilty of oral copulation of an unconscious person (Pen. Code,[4] § 287, subd. (f), Count 1), acquitted him of sexual battery by restraint (§ 243.4, subd. (a), Count 2), and convicted him of the Count 2 lesser included offense of sexual battery, a misdemeanor. (§ 243.4, subd. (e)(1).) The court imposed the midterm of six years in prison on Count 1 and "credit for time served" on Count 2,[5] with 1,580 total days of custody credit. This appeal is timely.

## DISCUSSION

### I. Mistake of Fact Instruction

Paniague contends the court's refusal to instruct the jury on the defense of mistake of fact as to copulation of an unconscious person (Count 1) violated his rights to due process and to present a complete defense. We disagree.

#### A. Background

Paniague's list of requested jury instructions included CALCRIM No. 3406 on mistake of fact.[6] After the parties rested, the court provided

---

[4] Unless otherwise noted, further statutory citations are to the Penal Code.

[5] We note that while the court ordered "credit for time served" on Count 2, the accompanying minute order specifies "364 Days at Fresno County Jail." A misdemeanor violation of § 243.4 is punishable "by imprisonment in a county jail not exceeding six months . . . ." Thus, the 364-day sentence as written in the minute order is impermissible. However, any error is harmless, as Paniague was awarded 1,580 days of custody credit (790 actual), which exceeded the misdemeanor term and was appropriately applied to his felony sentence.

[6] CALCRIM No. 3406 provides: "The defendant is not guilty of _____ <insert crime[s]> if (he/she) did not have the intent or mental state required to commit the crime because (he/she) [reasonably] did not know a fact or [reasonably and] mistakenly believed a fact.

7

counsel with the instructions it intended to give and conferred with them off the record. The court's proposed instructions included CALCRIM No. 3406 as to sexual battery (Count 2), but not as to oral copulation of an unconscious person (Count 1).

After the off-record conference, the court and counsel finalized the instructions on the record. The court asked defense counsel, "[A]re there any instructions that you had asked for and they're not included, meaning they're excluded, are they deemed withdrawn, if you had asked for it and it's not included?" Defense counsel responded, "Yes. The only one is the reference to good character, which is 350." After some discussion on the good character instruction, the court asked defense counsel whether the remaining instructions she had requested but were omitted from the final instructions were deemed withdrawn. She responded, "Yes." The court then confirmed, without comment or objection from counsel, that "[t]he instructions that are not part of the final package, that each side is withdrawing it." Later, immediately before instructing the jury, the court again asked defense counsel if she had any further comment on the instructions. She responded that she did not.

---

If the defendant's conduct would have been lawful under the facts as (he/she) [reasonably] believed them to be, (he/she) did not commit _____ *<insert crime[s]>*.

If you find that the defendant believed that _____ *<insert alleged mistaken facts>* [and if you find that belief was reasonable], (he/she) did not have the specific intent or mental state required for _____ *<insert crime[s]>*.

If you have a reasonable doubt about whether the defendant had the specific intent or mental state required for _____ *<insert crime[s]>*, you must find (him/her) not guilty of (that crime/those crimes)."

8

The court instructed the jury on Count 1 as follows: "The defendant is charged in Count 1 with oral copulation of a person who was unconscious of the nature of the act. To prove that the defendant is guilty of this crime, the People must prove that: One, the defendant committed an act of oral copulation with another person; two, the other person was unable to resist because she was unconscious of the nature of the act; and three, the defendant knew that the other person was unable to resist because she was unconscious of the nature of the act. [¶] . . . [¶] A person is unconscious of the nature of the act if she's unconscious or asleep or not aware that the act is occurring."

On Count 2, sexual battery by restraint, the court instructed the jury on mistake of fact with CALCRIM No. 3406, as follows: "The defendant is not guilty of Count 2 if he did not have the intent and/or mental state required to commit the crime because he did not know a fact or mistakenly believed a fact. If the defendant's conduct would have been lawful under the facts as he believed them to be, he did not commit Count 2. [¶] If you find that the defendant believed that he was in his and Rosario's bedroom and/or he believed Estrella to be Rosario, he did not have the specific intent or mental state required for Count 2, sexual battery by restraint or the lesser included crime of sexual battery without restraint."[7]

*B.    Analysis*

Preliminarily, the alleged instructional error was forfeited for appeal. While Paniague requested CALCRIM No. 3406 on mistake of fact, his list of requested instructions did not indicate whether the request was in relation to

---

[7] No issue is raised, and we express no opinion, as to the appropriateness of this instruction.

9

Count 1, Count 2, or both. Subsequently, after the jury instruction conference, he raised no objection to the court's omission of the instruction as to Count 1; to the contrary, defense counsel affirmed to the court that Paniague had withdrawn any requested instructions that were not included in its final packet. He therefore forfeited the issue for appeal. (*People v. Bolin* (1998) 18 Cal.4th 297, 328.)

Paniague disagrees, asserting the court was required to instruct sua sponte on mistake of fact as to Count 1. As we understand the current argument, Paniague claims he mistakenly thought he was in bed with Rosario, not Estrella. From that premise he asserts the jury could have found him not guilty of the oral copulation of an unconscious person because there was no evidence his wife (unlike Estrella) was a heavy sleeper; therefore, Paniague could reasonably have expected her to have woken up when he initiated sexual contact.[8] Paniague thus argues his alleged mistaken belief he was in Rosario's bed negated the knowledge requirement of Count 1, e.g., knowledge that the victim, whoever she was, was

---

[8] Paniague articulates a different theory in his reply brief, where he asserts his mistaken belief that Estrella was Rosario supported an affirmative defense to Count 1 because he could reasonably believe his wife had generally consented to sexual activity, whether or not she was unconscious. We need not address this assertion because theories raised for the first time in an appellant's reply brief are forfeited. (*Golden Door Properties, LLC v. County of San Diego* 2020) 50 Cal.App.5th 467, 559.) In any event, this argument fails because "neither a woman's actual 'advance consent' nor a man's belief in 'advance consent' could possibly eliminate the wrongfulness of the man's conduct in knowingly depriving the woman of her freedom of choice both at the initiation of and during sexual intercourse." (*People v. Dancy* (2002) 102 Cal.App.4th 21, 37 (*Dancy*).) While *Dancy* involved rape of an unconscious person, rather than oral copulation, its reasoning applies equally here.

unconscious. (§ 287, subd. (f); see *People v. Wiidanen* (2011) 201 Cal.App.4th 526, 531.) Not so. A trial court has no sua sponte obligation to instruct the jury on a defense theory that, like this one, would negate an element of a charged offense. (*People v. Lawson* (2013) 215 Cal.App.4th 108, 111, 118; *People v. Anderson* (2011) 51 Cal.4th 989, 996.)

Moreover, even if mistake of fact qualified as a separate affirmative defense,[9] the court was only required to give the instruction sua sponte if it was supported by substantial evidence. (*People v. Salas* (2006) 37 Cal.4th 967, 982.) "Substantial evidence is evidence from which a jury could conclude beyond a reasonable doubt that the lesser offense was committed. [Citations.] Speculative, minimal, or insubstantial evidence is insufficient to require an instruction on a lesser included offense." (*People v. Simon* (2016) 1 Cal.5th 98, 132.) To assess a record for substantial evidence we must review the whole record to determine whether it contains evidence that is reasonable, credible, and of solid value. (*People v. Cuevas* (1995) 12 Cal.4th 252, 260.

The record here lacks substantial evidence of mistake of fact as to Paniague's argued belief that the victim was not unconscious at the time of the sexual conduct. At most, Paniague equivocated to detectives about his

---

[9] To be clear, here, as in *People v. Lawson* (2013) 215 Cal.App.4th 108, 118–119, the defense of mistake of fact could only have served to negate the mental state element of the crime. *In re Jennings* (2004) 34 Cal.4th 254, on which Paniague relies, teaches that while a mistake of fact defense is generally only available if the mistake disproves an element of the offense, it can also serve as an affirmative defense to a category of strict liability "public welfare offenses" that do not incorporate a criminal intent element, such as bigamy or, as, in *Jennings,* purchasing alcohol for a person under age 21. (*Id.* at pp. 276–281.) Oral copulation of an unconscious person is not one of those "public welfare offenses," so *Jennings* is inapposite.

knowledge of the victim's status, first saying he did not know if she was asleep or awake and then that she was awake, but ultimately admitting she was asleep and that, to the extent she was aware of what he was doing, he believed Estrella thought he was Antonio. Estrella testified unequivocally that Paniague was on top of her with his hand and mouth on her breasts when she awoke with her pants down and a wet feeling in and on her vagina. The court was not required to instruct on mistake of fact on this record.

## II.    *Good Character Instruction*

Next, Paniague contends the trial court erred in refusing to instruct the jury on his good character for sexually appropriate behavior. He asserts the instruction was required because evidence of his prior sexually appropriate behavior toward Estrella and the other children supported his claim that he mistakenly believed he was sexually touching his wife rather than Estrella.

### A.    *Background*

Estrella testified that Paniague had never acted inappropriately toward her before the night in question. Ignacio testified he had never seen Paniague act in a sexually inappropriate manner with Estrella, and Rosario testified she had never seen him behave inappropriately with any of her children. Based on this testimony, Paniague asked the court to instruct the jury with CALCRIM No. 350[10] as to his character trait of behaving

---

[10] CALCRIM No. 350 provides: "You have heard character testimony that the defendant (is a _____ *<insert character trait relevant to crime[s] committed>* person/ [or] has a good reputation for _____ *<insert character trait relevant to crime[s] committed>* in the community where (he/she) lives or works).

Evidence of the defendant's character for _____ *<insert character trait relevant to crime[s] committed>* can by itself create a reasonable doubt

12

"appropriately towards Estrella and the other children." The court declined to give the instruction but observed that defense counsel could argue to the jury that neither Estrella, Rosario, nor Ignacio had previously accused Paniague of sexually inappropriate behavior with Estrella or the other children.

    *B.    Analysis*

    Evidence Code section 1101, subdivision (a) states the general rule that "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." Evidence Code section 1102 provides an exception to this general rule: "In a criminal action, evidence of the defendant's character or a trait of his character in the form of an opinion or evidence of his reputation is not made inadmissible by Section 1101 if such evidence is: [¶] (a) Offered by the defendant to prove his conduct in conformity with such character or trait . . . ." "This exception allows a criminal defendant to introduce evidence, either by opinion or reputation, of his character or a trait of his character that is 'relevant to the charge made against him.' [Citation.] Such evidence is relevant if it is inconsistent with

[whether the defendant committed _____ *<insert name[s] of alleged offenses[s] and count[s], e.g., battery, as charged in Count 1>*]. However, evidence of the defendant's good character may be countered by evidence of (his/her) bad character for the same trait. You must decide the meaning and importance of the character evidence. [If the defendant's character for certain traits has not been discussed among those who know (him/her), you may assume that (his/her) character for those traits is good.]

You may take that testimony into consideration along with all the other evidence in deciding whether the People have proved that the defendant is guilty beyond a reasonable doubt."

13

the offense charged—e.g., honesty, when the charge is theft—and hence may support an inference that the defendant is unlikely to have committed the offense. In appropriate cases, such circumstantial evidence 'may be enough to raise a reasonable doubt in the mind of the trier of fact concerning the defendant's guilt.' " (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1305 (*McAlpin*).)

In *McAlpin, supra,* 53 Cal.3d at pp. 1306–1309, on which Paniague principally relies, the Supreme Court applied Evidence Code section 1102 to hold that lay opinion testimony is admissible to establish a defendant's character for not being a sexual deviant if the opinion is: (1) inconsistent with the charged offense; and (2) based on the witness's personal observation.

Applying this rule, the court concluded the trial court erred in excluding opinion testimony that, based on the two lay witnesses' observations of the defendant's conduct with their daughters over time, the defendant was "not a person given to lewd conduct with children." (*McAlpin, supra,* 53 Cal.3d at p. 1309.) The court explained, "[T]he proffered testimony was intended to prove the relevant character trait not by specific acts of 'nonmolestation,' but by the witnesses' *opinion of that trait* based on their long-term observation of defendant's course of consistently normal behavior with their children." (*Id.* at pp. 1309–1310, italics added.)

This case presents a critically different situation: the evidence Paniague asserts supported the instruction was not authorized character evidence in the form of opinion or reputation. In contrast to *McAlpin*, Paniague did not seek to introduce character evidence[11] and did not ask

---

[11] Paniague did not move in limine for the admission of potentially admissible character evidence or initially seek related jury instructions.

Estrella, Rosario, or Ignacio to opine about his character or reputation for sexually appropriate behavior. Instead, their testimony was confined to their observations of "specific acts of 'nonmolestation,'" which *McAlpin* makes clear could not be used as proof of a character trait. (*McAlpin, supra,* 53 Cal.3d at pp. 1309–1310 and fn. 14.) The evidence presented thus did not support the requested instruction on character evidence.

For the first time in his reply brief, Paniague argues CALCRIM No. 350 was nonetheless required because this "specific acts" testimony was admissible under Evidence Code section 1101, subdivision (b)[12] to support his mistake of fact defense. But this argument is not properly before us. As we have already noted at page 10, footnote 8, *ante,* "arguments raised for the first time in a reply brief on appeal will not be considered, absent good cause for failure to present them earlier." (*Nordstrom Com. Cases* (2010) 186 Cal.App.4th 576, 583.)

Even so, had Paniague preserved this argument for appeal, it is unpersuasive. Evidence Code section 1101, subdivision (b) permits evidence the defendant committed a "crime, civil wrong or other act" as proof of a material fact, such as motive, intent, or knowledge, *"other than [the defendant's] disposition to commit such an act."* (Evid. Code, § 1101, subd. (b), italics added; see *People v. Villatoro* (2012) 54 Cal.4th 1152, 1159.) Paniague's new theory that his family's prior observation testimony was

---

[12] "Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act. (Evid. Code, § 1101, subd. (b).)

15

relevant to prove he mistook Estrella for his wife relies on the related inference that he does not have the disposition or character to molest his family's children, including Estrella. But Evidence Code section 1101, subdivision (b) explicitly bars the use of "specific acts of 'nonmolestation' " (*McAlpin, supra,* 53 Cal.3d at p. 1309) for that purpose. In the absence of admissible character evidence, the court properly declined to instruct the jury with CALCRIM No. 350.

III.     *Instruction on Attempted Oral Copulation as Lesser Included Offense*

Although he did not request an instruction on attempted oral copulation of an unconscious person, Paniague contends the trial court had a sua sponte duty to instruct the jury on the attempt offense because (1) it is a lesser included offense of oral copulation of an unconscious person; and (2) there was substantial evidence to support the instruction. Not so. Attempt is not a lesser included offense of the completed offense, so the court had no sua sponte instructional duty. (*People v. Braslaw* (2015) 233 Cal.App.4th 1239, 1247 (*Braslaw*) [no sua sponte duty to instruct on attempt unless it is a lesser included offense and supported by substantial evidence].)

*Braslaw* explains the nonintuitive aspect of the relationship between attempts and completed crimes: "[W]hile it might seem an attempt would naturally be a lesser included offense, this is not necessarily so. Attempts are only lesser included offenses if the sole distinction between the attempt and the completed offense is completion of the act constituting the crime. [Citation.] If the attempt requires a heightened mental state, as is the case with attempts of many general intent crimes, the attempt requires proof of an additional element and is therefore not a lesser included offense. [Citations.] ['[W]hen the completed offense is a general intent crime, an attempt to

16

commit the offense does not meet the definition of a lesser included offense under the elements test because the attempted offense includes a specific intent element not included in the complete offense'.]." (*Braslaw*, *supra*, 233 Cal.App.4th at p. 1248.)

Applying this framework, *Braslaw* holds that attempted rape of an intoxicated person is not a lesser included offense of rape of an intoxicated person. "Rape of an intoxicated person (§ 261, subd. (a)(3))[13] is a general intent crime. [Citation.] This is so even though there is an additional knowledge requirement—that 'the accused either must have known or reasonably should have known of the victim's particular condition that precluded consent.' [Citations.] In other words, the general intent and knowledge requirements are separate elements, and the latter does not transform rape of an intoxicated person into a specific intent crime. [Citation.] Thus, rape of an intoxicated person requires both (1) intent to engage in sexual intercourse and (2) either actual knowledge of the intoxicated victim's capacity or negligent belief the victim had the capacity to consent." (*Braslaw*, *supra*, 233 Cal.App.4th at pp. 1248–1249.)

In contrast, attempted rape of an intoxicated person requires an additional element. "Attempted rape, in accord with section 21a governing attempts, 'has two elements: (1) *the specific intent to commit the crime of rape* and (2) a direct, although ineffectual, act toward its commission.' [Citation.] The mere intent to have sexual contact is not a sufficiently culpable mental state for attempted rape." (*Braslaw*, *supra,* 233 Cal.App.4th

---

[13] Pursuant to section 261, subdivision (a)(3), an act of sexual intercourse is rape "[i]f a person is prevented from resisting by an intoxicating or anesthetic substance, or a controlled substance, and this condition was known, or reasonably should have been known by the accused."

17

at p. 1249, italics added.) Thus, to be guilty of attempted rape of an intoxicated person, a defendant must not only intend to have intercourse with a person he knows to be intoxicated; he must intend to have intercourse with a person incapacitated by intoxication.[14] (*Id.* at p. 1249.) Because the attempt offense imposes an additional mental state requirement concerning unconsciousness or intoxication, it is not a lesser included offense of the completed offense, and there is no sua sponte instruction obligation. (*Id.* at p. 1252; see *People v. Mendoza* (2015) 240 Cal.App.4th 72, 83 [attempted oral copulation with a child 10 years of age or younger is a specific intent crime and thus not a lesser included offense of the completed general intent offense].)

*Braslaw*'s reasoning is dispositive here. The elements of oral copulation of an unconscious person are: (1) the defendant committed an act of oral copulation; (2) the other person was unable to resist because he or she was unconscious of the nature of the act; and (3) the defendant knew the other person was unable to resist because he or she was unconscious of the

---

[14] This difference, while somewhat enigmatic, is ensconced in our jurisprudence. In *People v. Fontenot* (2019) 8 Cal.5th 57, 66, the Supreme Court recently elaborated on the " 'notoriously difficult . . . to define and apply' " distinction between general and specific intent. *Fontenot* explains that a defendant harbors the intent required for a completed general intent offense if he or she intentionally does the act that constitutes the crime without regard to his or her purpose for doing it. In contrast, to prove the specific intent required for an attempt offense the prosecution must also prove a design or purpose of achieving "a particular—usually harmful—end," or, put differently, a mental state that "entails an intent to cause the resulting harm." Intent offenses therefore "call[] for a more searching inquiry into the defendant's mental state," which involves consideration of the difference between "merely committing a physical act intentionally" and "engaging in goal-oriented, purposive thinking." *Id.* at p. 66–67.)

18

nature of the act. (*People v. Wiidanen, supra,* 201 Cal.App.4th at p. 531; § 287, subd. (f).) It is a general intent crime (*People v. Molano* (2019) 7 Cal.5th 620, 667), and, just as in *Braslaw,* the knowledge requirement does not transform it into a specific intent offense. (*Braslaw, supra,* 233 Cal.App.4th at pp. 1248–1249; see *Dancy*, *supra*, 102 Cal.App.4th at p. 36 ["The act prohibited by Penal Code section 261, subdivision (a)(4) is the act of sexual intercourse with an unconscious person. The statute also contains an explicit mental state requirement that precludes conviction without proof that the perpetrator knew of the victim's unconsciousness. The requisite general criminal intent is simply the intent to have sexual intercourse with an unconscious victim"].)

Paniague disagrees. He relies on *Dancy, supra,* 102 Cal.App.4th at pages 35–38, to argue rape of an unconscious person requires that the offender "not only know the person is unconscious, but must also have the wrongful intent to have intercourse with him or her while he or she remains unconscious." By parity of reasoning, he maintains, oral copulation of an unconscious person must also require the specific, wrongful intent to commit the offense. We disagree. *Dancy* expressly states the requisite intent is the general intent to have sexual intercourse with an unconscious victim; the characterization of that intent as "wrongful" because an unconscious victim is incapable of consenting does not convert the offense into one of specific intent. (*Id*. at p. 36; see *People v. Fontenot, supra,* 8 Cal.5th at pp. 66–67 and p. 18, fn. 14, *ante* [specific intent required for attempt involves goal-oriented, purposive thinking and intent to cause resulting harm].) Moreover, although *Dancy*, which predates *Braslaw* and *Mendoza* and therefore lacks the benefit of their reasoning, refers to "wrongful" intent, it did so in refuting the appellant's claim that the crime is a strict liability offense unless lack of

19

consent is an element (102 Cal.App.4th at p. 37); *Dancy* does not address the requisite mens rea of an attempt as a lesser included offense of the completed offense.[15]

Consistent with these authorities, we conclude that the heightened mental state required by an attempted oral copulation of an unconscious person means the attempt is not a lesser included offense of the completed offense. The trial court was therefore not required to instruct the jury on the attempt offense absent a request.

## DISPOSITION

The judgment is affirmed.

---

[15] "[C]ases are not authority for propositions not considered." (*City of Oakland v. Public Employees' Retirement System* (2002) 95 Cal.App.4th 29, 57.)

_____
Desautels, J.*

WE CONCUR:


_____
Pollak, P.J.


_____
Brown, J.

_A164263  People v. Paniague_

---

* Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

21