Filed 6/30/23  P. v. Robertson CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C094605 |
| Plaintiff and Respondent, | (Super. Ct. No. 17FE001859) |
| v. | |
| COREY KENT ROBERTSON, | |
| Defendant and Appellant. | |

Defendant Corey Kent Robertson and his codefendant Ricky Gonzalez brought three underage girls, D., G., and T., to defendant's apartment to drink alcohol and "party." After the girls became intoxicated, each was raped by defendant and two were also raped by Gonzalez. T. was unconscious while she was raped.

1

Defendant was convicted of three counts of rape of an intoxicated person (one count for each girl) and one count of rape of an unconscious person (involving T.).[1] The trial court sentenced him to serve an aggregate determinate term of 18 years in state prison.

On appeal, defendant contends: (1) the evidence is insufficient to establish the corpus delicti of the crimes involving T. and to support each of his convictions, and (2) the trial court prejudicially erred by instructing the jury on CALCRIM No. 375, modified to inform the jury that it could consider Gonzalez's uncharged sex offense evidence in determining whether there was a plan to commit the charged offenses.

As we explain, although no one witnessed defendant raping T., the circumstantial evidence is sufficient to prove the corpus delicti and substantial enough to support the jury's conclusion that defendant raped her while she was unable to resist due to intoxication and while unconscious. Substantial evidence also supports defendant's convictions as to D. and G. Finally, we find no error in modifying the jury instructions regarding the ability to consider other crime evidence as the instruction only pertained to Gonzalez. We affirm.

---

[1] With respect to D., defendant was also charged with one count of rape of an unconscious person but was acquitted of that charge. Defendant was further charged with three counts involving G., and he was acquitted of those charges. Defendant was also charged with two sex offenses regarding a fourth person allegedly committed in a separate event, but the jury found him not guilty of one of those charges and was unable to render a verdict as to the other, prompting the court to declare a mistrial on that final count. Gonzalez's jury convicted him of three counts of rape of an intoxicated person (two counts involving D. and one involving T.), one count of oral copulation of an intoxicated person (involving D.), and one count of rape of an unconscious person (involving T.). Gonzalez's convictions were affirmed on appeal. (*People v. Gonzalez* (Dec. 5, 2022, C094199) [nonpub. opn.].)

## LEGAL AND FACTUAL BACKGROUND

In July 2016, D., T., and G. went to the mall together. G. was 17 years old at the time. She had known T., a year younger, since elementary school and they were best friends. G. met D., who was also 17 years old, for the first time that day. T. and D. were friends; they met in juvenile hall.

At the mall, the girls met up with defendant and Gonzalez, who were 26 and 24 years old, respectively.[2] D. knew Gonzalez through social media and had previously met him once in person. In a message through Instagram, D. invited Gonzalez to come to the mall and "hang out and maybe . . . have some drinks." Gonzalez and defendant accepted the invitation.

### A. Prosecution's Case

Gonzalez asked the girls if they wanted to go get drinks. Thinking he meant to go to a bar, D. said she wasn't old enough; she was only 17 years old. They decided to drink at defendant's apartment.

Defendant lived in a different county. As they left the mall, T. became nervous because she was on probation and had an ankle monitor that would alert authorities if she left the county. Defendant said she should cut it off and throw it out the window. T. declined to do so. However, at some point, one of the girls disconnected T.'s ankle monitor and threw it over a fence.

At the apartment, they each took two shots of vodka, in succession. Defendant then left to buy different alcohol, possibly rum. When he returned, everyone took a shot of that alcohol. G. and T. sat at the kitchen table while D. sat on the couch. Gonzalez flirted with D. while defendant flirted with G. and T. The group continued drinking.

---

[2]   As this appeal involves only defendant Robertson, we discuss Gonzalez's participation in these events only to the extent that it provides context for defendant's conduct.

*i. D.'s Testimony*

At some point, D. felt the effects of the alcohol and stepped out onto the balcony to get some fresh air. Gonzalez followed her outside and became "very flirtatious," grabbing D. by the waist and hugging her from behind. D. told him to stop and said that she had a boyfriend. Gonzalez eventually convinced her to come back inside and D. returned to the couch.

Gonzalez offered D. more alcohol but she declined. She said she was drunk and felt dizzy and "loopy." D. saw G. and T. take more shots. D. said she "felt way too drunk" and went into the bathroom to throw up. Gonzalez followed her into the bathroom. She told him she was trying to throw up and to get out. D. testified that Gonzalez then pulled down his pants and put his penis against her face. She was shocked and briefly blacked out. D. testified that when she regained awareness, her face was being pushed against the bathroom mirror by Gonzalez who then sexually assaulted her.

D. and Gonzalez then exited the bathroom and D. stumbled into the room with Gonzalez behind her, helping her stay on her feet as they went through the door. Inside the room, D. saw defendant having sex with G. on his bed. D. saw defendant "penetrating her, and they're having sex, like she's pretty much bouncing on him."

Gonzalez threw D. onto the same bed. D. testified she blacked out and didn't remember anything that happened then until she saw defendant's face as he was having sex with her. D. testified she was scared and wanted it to be over so she could leave. She didn't say anything; she didn't know what to say. After defendant stopped, he and Gonzalez tried to get D. and G. to orally copulate each other. At some point, D.'s face was in G.'s vaginal area but D. did not remember how that happened. D. testified defendant held her head down while her face was near G.'s vaginal area. She looked up and found she was being recorded at that time. D. described G. as "really drunk" and "sloppy, out of it, talking, really slurring her words."

4

Defendant used Snapchat to take a video of T., G., and D. while they were at his apartment. The video depicts T. lying unconscious on the living room floor without her shorts or underwear. While recording, defendant moved one of her legs to expose her vagina. During this portion of the video, defendant can be heard saying, "You know what's going down right now, my nigga. I got that 'A-1' right there." Defendant then quickly moves over to the bedroom, where D. and G. appear to be engaging in oral copulation on defendant's bed. Text appearing over the video says: "I got 3 hoes to myseclf [*sic*] turning the fuck up. Two hoes in the bed. 3on 1."

After the event involving oral copulation, the next thing D. remembered was being in a closet with G. and both defendant and Gonzalez. Defendant and Gonzalez then left D. and G. alone in the closet. D. was scared and confused and asked G. why they were in the closet, but G. did not answer. D. left the closet and saw T. lying face down on the living room floor in her own vomit, with her shorts halfway down her legs. D. did not see T. in the bedroom or see anyone have any type of sexual contact with T.

D. tried to obtain a ride home but was unsuccessful. D. identified a photo of herself, sitting on the couch, texting, taken after the assaults. The photo also captured G. on the couch and T. on the floor with no underwear or pants. Defendant, who took the photo, wrote an accompanying caption that said, "when u destroyed all 3."

D.'s next memory was being back in defendant's car with G. and T. All the girls "were completely out of it" in various levels of consciousness. At some point, D. was pulled out of the car and left in front of an unfamiliar apartment complex. The next thing she remembered was waking up on the grass by the apartment complex. T. was passed out face down on the grass. D. did not have her underwear, shoes, phone, or purse.

A short time after the event, D. went back to defendant's apartment in an effort to obtain the missing belongings. Outside, she found the carpet T. was lying on rolled up; it still had vomit on it. She also found a garbage bag containing her underwear and shoes, G.'s purse, and a few other things. She did not find her phone, so she kicked defendant's

5

apartment door in to find it. D. described the apartment as a mess like it had been ransacked. She testified she could see prints from her face and hands on the bathroom mirror and condoms thrown on the floor.

*ii. G.'s Testimony*

G. estimated taking about 10 shots of alcohol. G. took several shots poured for T.; G. saw T. drink two shots. G. did not remember any of the sexual activity, leaving the apartment, or getting into defendant's car. Her next memory that night was getting out of the car with D. and T. at a different apartment complex. She was also without her shoes, purse, and cell phone. G. was drunk, but was worried about T. G. said T. was trying to walk but kept falling over. T. looked sick and wasn't really responding. At one point, T. was on the ground, vomiting. G. said she was also trying to help D. walk, but D. was "not as bad" as T. G. did not remember approaching a woman in a car at the apartment complex or asking her for help.

*iii. T.'s Testimony*

T. testified she had three to five shots of alcohol and felt really drunk. She was dizzy, walking sideways, and her speech was slower. She sat in the living room texting a friend. The next memory she had of the evening was waking up at the hospital later that night. She was wearing a shirt and shorts but was missing her bra, underwear, shoes, purse, and cell phone. It took until the next afternoon to start feeling more like herself again. T. had no memory of anybody touching her in a sexual way and she did not notice any soreness in her genitalia. She had no feeling or sensation that she'd had sex with anyone.

*iv. Trasie Mason*

Trasie Mason testified that she was going to her sister's apartment and observed a group of young girls sitting on the grass near the gate to the apartments. According to Mason, the girls were "either on something or drunk." One girl was lying down and another girl was "holding her legs and rocking." A third girl from the group, most likely

6

G., approached her and asked for help. The girl was slurring her words and could barely talk or stand up. Mason called 911. Police and paramedics arrived a short time later.[3] T. was transported to the hospital for acute alcohol intoxication.

### v. Dr. Hoover

Dr. Natalie Hoover, an emergency physician, treated T. at the hospital on the day of the incident. T. had an episode of vomiting and cognitive impairment; her blood alcohol level was 0.27 percent. Despite the order for a toxicology report, T. failed to provide a urine sample to test for drugs. T. was discharged from the hospital a few hours later.

### vi. Dr. Vickers

Almost a week after the incident with defendant and Gonzalez, Dr. Angela Vickers conducted a forensic exam on T. that included DNA recovery and looking for possible injuries. While examining T., Dr. Vickers found an injury to her right shoulder and left knee. T. reported profound memory loss of the event and profound sedation during the event. Dr. Vickers did not find any evidence of trauma or injuries to T's anus and genital area, but she took swabs from T.'s genital area. Dr. Vickers explained that a normal exam finding, such as here, could be consistent with no sexual assault. A normal exam finding could also be consistent with situations where there was a sexual assault because genital tissue heals "very, very quickly," and the tissue stretches to accommodate sexual intercourse without having any injury, particularly "if the patient's very relaxed, such as in an unconscious patient." She also explained that when an exam is conducted four to five days after the last sexual contact, there is a less than 1 percent chance of

---

[3] G.'s aunt took D. and G. home. By the time G. got home, her vagina and anal area were sore. A couple of days later, G. noticed she had bruises on the insides of both her thighs near her vaginal area. D. told the police "a whole different story" than relayed through her testimony. She said she eventually told her probation officer what happened that night.

7

finding DNA. "And then beyond day five, it's even less, you know, very minimal, almost nonexistent as far as ability to recover DNA using the most updated DNA technology." By the time of the exam, it had been six days since the incident and T. had bathed and cleaned her body multiple times.

### vii. Nikki Sewell

Criminalist Nikki Sewell performed body fluid identification and DNA analysis on the sexual assault evidence collection kit taken from T. and the T-shirt and shorts worn by T. on the day of the incident.[4] Defendant and Gonzalez were possible contributors to sperm found on the inside and outside of the fly area, as well as on the inside of the crotch area of the shorts. Sewell testified that she could not say how the sperm and DNA were deposited on the shorts. It was possible it got there by direct ejaculation, drainage from T.'s body, or transferred there another way, such as by coming into contact with a contaminated surface.

### B. Defense Case

### i. Sara Porter

Sara Porter, an expert in forensic toxicology, testified that when a person drinks alcohol, there is a procession of symptoms of impairment. She also testified that in an alcohol-induced blackout, memories are not recorded, so they are not able to be accessed later. "During that time, a person's other functions may still be working, so you may have a person who is able to carry on a conversation, eat a meal, try to drive a car. They might do things while their brain is not actually recording those memories." Porter testified that if a person has reached the point of a blackout, she would expect there to be

---

**4**      The four vaginal swabs taken during the forensic exam were negative for acid phosphatase, which is an enzyme found in semen and, at lower levels, in other bodily fluids. Vulva swabs tested positive for acid phosphatase but negative for sperm or other bodily fluids. Cervical swabs also tested negative for sperm.

symptoms of impairment such as not looking completely sober, possibly slurred speech, and impaired ability to walk.

*ii. Defendant's Testimony*

Defendant testified in his own defense. He and Gonzalez met up with the girls, whom he believed to be in their early 20's. At some point during their conversation, D. said that she wanted to party, and defendant drove the group to his apartment. On the drive, T.'s ankle monitor started making a loud noise, which surprised him. She told the group that she had gone to jail for stealing and that is where she had met D. Someone suggested that T. cut the monitor off and throw it out the window.

At the apartment, the group started socializing and drinking, eventually spreading out around the apartment. Defendant noticed that Gonzalez and D. were missing. Upon investigation, he heard sounds in the bathroom indicating that D. and Gonzalez were having sex. When defendant told G. and T. that D. and Gonzalez were having sex, they laughed it off.

Defendant claimed that, by this point, he had had more than eight drinks that day. He had not noticed anything unusual about how T. or G. were acting. Not long after, Gonzalez and D. rejoined the group in the living room. To defendant, neither appeared impaired to a concerning degree.

At some point, defendant noticed that G. was not in the living room, and he found her near his bedroom. She laughed and walked into the room. Defendant followed her into the bedroom. Inside the room, G. mentioned that defendant had a big bed and she jumped on it. Defendant claimed that G. was acting normal at this point. They removed their clothing and started to have sex. While he was having sex with G., D. came to the doorway and made a comment. Eventually, D. and Gonzalez joined defendant and G. in the bedroom. D. and Gonzalez had sex on the bed while defendant and G. had sex. According to defendant, there was no indication from anyone in the room that they did not want to have sex.

9

Defendant testified that, after some time, T. walked into the room. She took off her shorts and got on the bed near G. T. started to kiss G. Defendant recalled that, while all of this was occurring, Gonzalez asked him if he had towel. When defendant told him no, Gonzalez used T.'s shorts to wipe himself. Defendant testified, "At some point, it went from me having sex with [G.] to me having sex with [D.]" Afterward, defendant also used T.'s shorts to wipe himself.

Defendant walked into the living room and found Gonzalez on the balcony smoking and T. on the couch with an alcohol bottle in her hand. Defendant took the bottle from T., poured himself some shots, and returned to the bedroom. G. and D. were in the bedroom talking. Defendant lay down on the bed and fell asleep. When he woke up, defendant heard moaning and found G. on her stomach and D. had her face in G.'s groin area. Defendant told D. not to move because he wanted to Snapchat the scene. Defendant ran into the living room to grab his phone.

In the living room, defendant found T. asleep on the living room floor. Defendant went to Snapchat and recorded T. Defendant moved T.'s leg to expose her genitals. When he noticed that T. was sleeping heavily, he jumped over the couch and started recording D. and G. in the bedroom. Shortly after he had started recording, D. stopped. Defendant said he stopped recording and went back to sleep. When he woke, defendant found G. and D. both sitting on the couch on their phones and Gonzalez at the table. T. was still lying on the floor. He took a picture of the girls in the living room. The only person that gave him concern at this point was T. because she was overly intoxicated.

G. and D. helped T. to defendant's car. T. was fully clothed when she left his home. Defendant was concerned that the Snapchat video he took from that night might make people perceive him in the wrong manner. He claimed to have permission from D. and G. to take the video, but he admitted that T. never gave him permission to record her.

10

Defendant testified that he drove to the apartment complex at G.'s direction. G. told him to leave them near the bench where police later found them. After he had helped them get out of the car, defendant said goodbye and left.

The next day, defendant found his apartment door kicked in and his apartment trashed. He called the police. As he took inventory of his apartment, defendant found a note that said, "We want out phones back, assholes. Our cousins are from the South, and if we don't get them back, they'll be back." Defendant cleaned his apartment and quickly left.

## DISCUSSION

### *I*

### *Sufficiency of the Evidence*

Defendant contends the evidence is insufficient, aside from his statements on the video, to establish the corpus delicti for raping T. He further claims the evidence was insufficient to support his convictions for raping any of the girls while they were unable to resist due to intoxication or while unconscious. We disagree.

The offense of rape of an intoxicated person requires proof of (1) an act of sexual intercourse, (2) where the victim "is prevented from resisting by an intoxicating or anesthetic substance, or a controlled substance," and (3) "this condition was known, or reasonably should have been known" by the defendant. (Pen. Code, § 261, subd. (a)(3).) CALCRIM No. 1002, as given here, informed the jury "[a] person is *prevented from resisting* if he or she is so intoxicated that he or she cannot give legal consent. In order to give legal consent, a person must be able to exercise reasonable judgment. In other words, the person must be able to understand and weigh the physical nature of the act, its moral character, and probable consequences. Legal consent is consent given freely and voluntarily by someone who knows the nature of the act involved. [¶] The defendant[] [is] not guilty of this crime if he actually and reasonably believed that the woman was capable of consenting to sexual intercourse, even if that belief was wrong. The People

11

have the burden of proving beyond a reasonable doubt that the defendant did not actually and reasonably believe that the woman was capable of consenting. If the People have not met this burden, you must find the defendant not guilty. [¶] . . . [¶] However, if, as a result of self-induced intoxication, the defendant believed that the female was consenting, that belief would not thereby become either reasonable or in good faith unless from all the surrounding circumstances other than self-induced intoxication you should find that the defendant's belief that the female was consenting was reasonable and in good faith. The People have the burden of proving beyond a reasonable doubt that the defendant did not actually and reasonably believe that the woman consented. If the People have not met this burden, you must find the defendant not guilty."

The similar, but separate, crime of rape of an unconscious person requires proof of (1) an act of sexual intercourse, (2) where the victim "is at the time unconscious of the nature of the act," and (3) "this is known" by the defendant. (Pen. Code, § 261, subd. (a)(4).) For purposes of this latter crime, "unconscious of the nature of the act" is defined to include "unconscious or asleep." (*Id*., subd. (a)(4)(A).) CALCRIM No. 1003, as given here, explained that "[a] woman is *unconscious of the nature of the act* if she is unconscious or asleep or not aware that the act is occurring."

*A. The corpus delicti of T.'s rape was established.*

Defendant contends there was insufficient evidence that he raped T. as nobody saw him have sex with T., T. did not provide any indication she had sex that night, and there was no physical evidence that defendant had intercourse with her. He argues that the DNA evidence found on T.'s shorts was insufficient to show intercourse and because the only evidence suggesting he had intercourse with T. was his own statements in the video, his conviction violated the corpus delicti rule.

In a criminal trial, the prosecution must prove the corpus delicti, or the body of the crime itself—the fact of loss, injury, or harm caused by a criminal act. (*People v. Alvarez* (2002) 27 Cal.4th 1161, 1168-1169 (*Alvarez*).) "The corpus delicti rule requires that the

corpus delicti of a crime be proved independently from an accused's extrajudicial admissions." (*People v. Jennings* (1991) 53 Cal.3d 334, 364 (*Jennings*).) The truth-in-evidence provision of the California Constitution (Cal. Const. art. 1, § 28, subd. (f)(2)) abrogated the corpus delicti rule insofar as the rule restricts the admissibility of the incriminatory extrajudicial statements by the accused. (*Alvarez*, at p. 1174.) *Alvarez* recognized that, in light of the truth-in-evidence provision, "[i]f otherwise admissible, the defendant's extrajudicial utterances may be introduced in his or her trial without regard to whether the prosecution has already provided, or promises to provide, independent prima facie proof that a criminal act was committed." (*Id.* at p. 1180.) However, the corpus delicti rule requiring some independent proof of the corpus delicti to convict a defendant who makes an incriminating statement remains in force "to ensure that one will not be falsely convicted, by his or her untested words alone, of a crime that never happened." (*Id.* at p. 1169; see *id.* at p. 1165.)

"In other words, as a result of this partial abrogation, the evidence of unsupported extrajudicial statements is now admissible, but conviction still requires independent proof of the corpus delicti." (*People v. Ramirez Ruiz* (2020) 56 Cal.App.5th 809, 830-831.) The independent proof may be circumstantial and is sufficient if it permits an inference of criminal conduct, even if a noncriminal explanation is also possible. (*Alvarez, supra*, 27 Cal.4th at pp. 1171, 1181.) The amount of independent proof of a crime can be slight or minimal. The prosecution need make only a prima facie showing permitting the reasonable inference that a crime was committed. Once the necessary showing of independent evidence is met, the defendant's extrajudicial statements may be considered by the jury to strengthen the case on all issues. (*Id.* at p. 1181; *People v. Jones* (1998) 17 Cal.4th 279, 301-302 (*Jones*).)[5]

---

[5] When a defendant's statements form part of the prosecution's case, the trial court must instruct sua sponte that a finding of guilt cannot be predicated on the statements

13

At trial, defendant did not object on the basis of the corpus delicti rule. There is authority for the proposition that lack of such an objection forfeits this claim on appeal. (See *People v. Martinez* (1994) 26 Cal.App.4th 1098, 1103-1104; *People v. Sally* (1993) 12 Cal.App.4th 1621, 1628; but see *Alvarez, supra*, 27 Cal.4th at p. 1172, fn. 8 ["No decision of this court . . . has suggested that an evidentiary objection at trial is a prerequisite to raising . . . *sufficiency* claims on appeal"].) We will address the issue on the merits. In doing so, we note that in establishing the corpus delicti, the "prosecution need not adduce 'independent evidence of every physical act constituting an element of an offense.' [Citation.] Instead, it need only make 'some indication that the charged crime actually happened,' so as to ensure 'that the accused is not admitting to a crime that never occurred.' " (*People v. Krebs* (2019) 8 Cal.5th 265, 317.)

We review the evidence to determine if this " 'slight or prima facie' " standard has been met. (*Jennings, supra*, 53 Cal.3d at p. 368.) We conclude the prosecution's independent evidence is sufficient to meet the low threshold of proof required to satisfy the corpus delicti rule. In doing so, we find the following cases support our conclusion.

In *Jones, supra*, 17 Cal.4th 279, the defendant and another man, Trone, abducted the victim and committed various sex offenses against her, including forcible rape and forcible oral copulation, before the defendant shot her in the head and left her to die on the side of an isolated road. (*Id*. at pp. 291-292.) The defendant admitted to police that Trone forced the victim to orally copulate him in the backseat while the defendant drove. Accordingly, in addition to murder and other crimes, the defendant was charged with

---

alone. (*Alvarez, supra*, 27 Cal.4th at p. 1170.) The corpus delicti rule is defined in the CALCRIM No. 359 instruction. (*People v. Rosales* (2014) 222 Cal.App.4th 1254, 1258-1259.) Here, CALCRIM No. 359 was given and the jury was instructed, in part, "[y]ou may only rely on the defendant's out-of-court statements to convict him if you conclude that other evidence shows that the charged crime was committed. [¶] That other evidence may be slight and need only be enough to support a reasonable inference that a crime was committed."

forcible oral copulation as an accomplice. (*Id.* at p. 300.) However, while semen was found in and around the victim's vagina and rectal area, no semen was found in her mouth. (*Id*. at p. 302.) The defendant argued at the preliminary hearing that the prosecution had no independent evidence of the corpus delicti of forcible oral copulation. The magistrate agreed and did not hold him to answer for that crime. The defendant then filed a motion under Penal Code section 995 to set aside the subsequent information that charged the defendant with forcible oral copulation notwithstanding the magistrate's ruling. The trial court denied the motion, finding the prosecution's corpus delicti burden had been met. (*Jones*, at pp. 300-301.)

Our Supreme Court agreed with the trial court, explaining: The victim "was found some 10 feet from the roadway on a dirt median. She had been shot in the head and was alive when found, but died shortly thereafter. Medical experts found bruises on her thighs, knees, legs, and perineal area. She also exhibited injuries on her hands. Results from the sexual assault kit revealed the presence of semen inside her vagina, on her external genitalia, and in her rectal area. No trace of semen was found in [the victim]'s mouth; an expert testified, however, that negative test results were not inconsistent with oral copulation because the mouth's natural rinsing processes eliminate semen. [The victim] was not wearing underpants, a brassiere, or shoes. Evidence showed she customarily wore such clothing." (*Jones, supra*, 17 Cal.4th at p. 302.) The court continued: "Keeping in mind the low threshold of proof required to satisfy the corpus delicti rule, we conclude that the magistrate erred in finding this low threshold was not met by the evidence presented at the preliminary examination. The state of the victim's clothing (no underwear or shoes) and the forensic evidence (semen in the victim's vagina and on her external genitalia and anus) indicates multiple sexual acts occurred. That the victim was forcibly abducted, beaten, shot in the head, and left by the side of the road for dead gives rise to an inference that the sexual activity that occurred was against the victim's will. This circumstantial evidence of multiple forcible sexual acts sufficiently

15

establishes the requisite prima facie showing of both (i) an injury, loss or harm, and (ii) the involvement of a criminal agency." (*Ibid.*) The court also rejected the defendant's argument "that the lack of evidence of the *specific* loss or harm," i.e., the fact that no semen was found in the victim's mouth, "is fatal to the establishment of the corpus delicti" of forcible oral copulation. (*Ibid.*) Relying on *Jennings, supra*, 53 Cal.3d 334 and *People v. Robbins* (1988) 45 Cal.3d 867, which we discuss immediately below, the court held the corpus delicti requirement is "not so strict." (*Jones*, at p. 302.)

In *Jennings, supra*, 53 Cal.3d 334, the defendant, who was convicted of multiple murders, challenged an accompanying rape conviction as unsupported by sufficient evidence of the corpus delicti. (*Id.* at p. 366.) Our Supreme Court found the evidence, although "minimal," to be sufficient, explaining: "The evidence shows that the victim . . . was found, unclothed, in an irrigation canal. She had been dead several weeks. Although her body was badly decomposed, experts determined she had suffered a broken jaw. While this evidence would satisfy the corpus delicti of murder (there being evidence that she died through the involvement of a criminal agency), the evidence of rape was not strong. For example, because of the advanced state of decay, there was no evidence of seminal fluids on the body [citations], or evidence of penetration [citations]. Further, there was no evidence that the victim's clothes were arranged in such a manner as to suggest a sexual assault. [Citation.] [¶] Although the evidence of rape is thus minimal, we nevertheless deem it sufficient to satisfy the corpus delicti rule. When the body of a young woman is found unclothed in a remote locale, an inference arises that some sexual activity occurred, thus satisfying the requirement that there be some showing of a loss, injury, or harm." (*Id.* at p. 367.) "While the inference of sexual activity is by no means the only, or even the most compelling, one in this case [citation], it nevertheless remains a reasonable one, at least for corpus delicti purposes. Further, it is important that the victim was found in a location where her lack of clothing was not easily explainable, that she was dead, and that she had suffered a broken jaw. From these factors, we may infer

that whatever sexual activity occurred, it occurred against the victim's will. The evidence thus satisfies the second prong of the corpus delicti rule, i.e., the involvement of a criminal agency." (*Id*. at pp. 367-368, italics omitted.)

Similarly, in *People v. Robbins, supra*, 45 Cal.3d 867, another murder case, our Supreme Court held the following to be sufficient independent evidence of the corpus delicti of lewd or lascivious conduct with a child: "Defendant was seen by one witness riding a motorcycle in the area of (and on the date of) the victim's disappearance, and the victim was last seen by another witness riding a motorcycle with a man matching defendant's description; no clothes were found at the scene of the crime; defendant's own experts described his 'primary diagnosis' as pedophilia; his admission of similar sexual conduct as to the very similar Texas crimes was confirmed by scientific evidence; and finally, the physical evidence of the homicide lends reliability to other aspects of defendant's confession, namely, his description of the lewd and lascivious conduct. In view of the nature of the offense and the circumstances of this case (i.e., the body was not discovered for some time, hence it was impossible to verify the sexual conduct by scientific evidence, and there were apparently no eyewitnesses to the crime) we do not believe the corpus delicti rule can be interpreted to call for more; the law does not require impossible showings." (*Id.* at p. 886.)

Returning to *Jones, supra*, 17 Cal.4th 279, our Supreme Court stated: "As *Jennings* and *Robbins* demonstrate, we have never interpreted the corpus delicti rule so strictly that independent evidence of every physical act constituting an element of an offense is necessary. Instead, there need only be independent evidence establishing a slight or prima facie showing of some injury, loss or harm, and that a criminal agency was involved." (*Id.* at p. 303.)

In this case, as in *Jones*, *Jennings*, and *Robbins*, there was no scientific evidence verifying sexual intercourse took place. There was no evidence of injury or trauma to T.'s genital area, nor was there evidence of semen or sperm found inside her vagina. As

17

with the cases above, we do not find this significant enough to undermine proof of the corpus delicti. As in *Jones*, *Jennings*, and *Robbins*, the lack of scientific proof of intercourse was reasonably explained. Given the time between the incident and forensic examination, it was not surprising that sperm was not found on the swabs taken from T.'s body. The exam was conducted six days later, and Dr. Vickers testified that at that point there was an "almost nonexistent . . . ability to recover DNA." Similarly, Dr. Vickers testified that the genital tissue heals "very, very quickly" and the tissue stretches to accommodate sexual intercourse without injury, especially if the patient is very relaxed and/or unconscious at the time of the sexual activity. Thus, the lack of vaginal injuries does not result in a failure to prove the corpus delicti.

Overall, the circumstantial evidence was sufficient to provide a reasonable inference that T. was raped while unconscious and too intoxicated to resist. First, there was overwhelming evidence that T. was very intoxicated; she drank alcohol to the point of vomiting and passed out on the floor where she spent a large portion of the evening. By the time she arrived at the hospital several hours after the sexual activity, her blood alcohol level was 0.27 percent. T. was unconscious and unclothed around the time defendant had sex with G. and D. who, as discussed below, were too intoxicated to resist. Defendant had access to T., who was in an area away from the other two girls in the bedroom, making it less likely that the other two girls could see or object. The DNA evidence also supports the reasonable inference that defendant had intercourse with T., as defendant was a possible contributor to the sperm found on the inside of the crotch area of T.'s shorts and it was possible that the sperm was deposited through drainage once T. was wearing her shorts again—especially since T. left the apartment without her underwear and was only wearing her shorts when she arrived at the hospital. The circumstances around T.'s unclothed state while separate from her friends and the DNA evidence found on her shorts where drainage would have been deposited are not otherwise easily explained.

18

We find the evidence in this case stronger than in the cases cited by defendant. For example, in *Hall v. Superior Court* (1953) 120 Cal.App.2d 844, 849-850, an opinion that the decedent's liver was ruptured by a blow was insufficient to warrant the conclusion that any such blow was inflicted unlawfully. Similarly, in *Iiams v. Superior Court* (1965) 236 Cal.App.2d 80, 83-84, the evidence established only that a man brought an infant child to a hospital for treatment. The child was in respiratory distress, had a low blood count, had a large bruise on the left cheek, and had a left ear that was almost totally torn off. (*Id.* at p. 82.) Yet there were no facts, excluding statements by the petitioner, from which it could be concluded that these injuries were caused by a human being, or resulted from other than an accidental or negligent act. (*Id.* at pp. 83-84.)

Two additional cases relied upon by defendant involved the question of admissibility of defendant's statement—the abrogated part of the corpus delicti rule—and had less factual support for the corpus delicti than those present here. In *People v. Schuber* (1945) 71 Cal.App.2d 773, the only evidence of criminal sexual activity outside of the defendant's confession was that the defendant's stepdaughter had a recent laceration on her vagina and slept in the same bed with defendant. The court noted the rule that the extrajudicial, uncorroborated admissions of a defendant may not be considered in the absence of substantial independent proof of the corpus delicti. (*Id.* at pp. 775-776.) In *In re Flodstrom* (1954) 134 Cal.App.2d 871, 875 the court noted the evidentiary requirement for admitting a defendant's statements. Aside from the petitioner's statement that she crammed the baby's pajama sleeve into its mouth, the only evidence presented was that a police officer found the deceased baby lying on his back in his crib, there were no visible signs of violence, the officer did not see the pajama sleeve in the baby's mouth, and one sleeve of the pajama top was damp and had two small blood spots on it. (*Id.* at pp. 872-873.)

As the case law provides, the inference that the crime took place need not be overwhelming, or even the most compelling. (See *People v. Krebs, supra*, 8 Cal.5th at

19

p. 317 [the required amount of independent proof to satisfy the corpus delicti rule is quite small and " need only make 'some indication that the charged crime actually happened' "].) Contrary to defendant's claim, the evidence here was sufficient to satisfy the corpus delicti rule. As explained further below, there is substantial evidence to support his convictions.

   *B. Substantial evidence supports defendant's convictions.*

   "When reviewing a challenge to the sufficiency of the evidence, we ask ' "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' [Citation.] Because the sufficiency of the evidence is ultimately a legal question, we must examine the record independently for ' "substantial evidence— that is, evidence which is reasonable, credible, and of solid value" ' that would support a finding beyond a reasonable doubt. [Citation.]" (*People v. Banks* (2015) 61 Cal.4th 788, 804.)

   "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict. [Citation.]" (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) "The same standard governs in cases where the prosecution relies primarily on circumstantial evidence. [Citation.] We 'must accept logical inferences that the jury might have drawn from the circumstantial evidence. [Citation.]' [Citation.] 'Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt. [Citation.]' [Citation.] Where the circumstances reasonably justify the trier of fact's findings, a reviewing court's conclusion the circumstances might also reasonably be reconciled with a contrary finding does not warrant the judgment's reversal. [Citation.]" (*Id*. at pp. 357-358.) We do not reevaluate the credibility of witnesses or

20

resolve factual conflicts; rather, we presume the existence of every fact in support of the verdict that reasonably could be inferred from the evidence. (*People v. Brady* (2010) 50 Cal.4th 547, 564.)

### 1. *Rape of Intoxicated and Unconscious T.*

As to T., defendant argues there was no evidence that he actually had intercourse with T. and, if he did, there was no evidence that he did so while she was too intoxicated to resist or unconscious. No so.

First, there was substantial evidence that defendant had intercourse with T. At trial, defendant admitted he had sex with D. and G. and that he engaged in sexual activity with D. right after Gonzalez. In the video and message typed over the picture of the girls, he also made statements that could reasonably be considered as an admission he also had sex with T. Defendant videotaped himself spreading T.'s bare legs open to reveal her vagina, while stating, "You know what's going down right now, my nigga. I got that 'A-1' right there." Defendant's tone in making this statement can reasonably be characterized as reporting an accomplishment. The video further shows defendant quickly moving over to the bedroom, where D. and G. appear to be engaging in oral copulation on defendant's bed. Text appearing over the video read: "I got 3 hoes to myseclf [*sic*] turning the fuck up. Two hoes in the bed. 3on 1." Defendant took a different photo after the sexual activity and wrote "when u destroyed all 3." In this photo, T. was still on the floor, naked from the waist down. Defendant seemingly bragged that he had sex with all three girls.

Moreover, defendant's DNA was on the inside crotch area of T.'s shorts. Indeed, defendant does not dispute his DNA was found on the shorts; he disputes how it was deposited there. Defendant said T. came into the bedroom while he was having sex, took off her shorts, and both he and Gonzalez used her shorts to wipe themselves off after having sex. While defendant's account of how DNA got onto T.'s shorts is theoretically possible, the jury was not required to believe it. Moreover, that account was undermined

21

by the fact that D. did not remember T. being in the bedroom, let alone taking her shorts off. It was for the jury to determine the credibility of each account. Indeed, the more plausible explanation for how defendant's DNA, as well as that of Gonzalez, got onto T.'s shorts is that these defendants had sex with her while she was intoxicated and unconscious on the living room floor.

As for the timing of the intercourse with T., defendant's contention that there was insufficient evidence that the sexual activity took place while T. was too intoxicated to resist or unconscious is manifestly unreasonable. The evidence shows T. drank early, quickly becoming intoxicated. T. testified that she had three to five shots of alcohol and soon felt drunk; she was dizzy, walking sideways, and her speech was slower. The evidence also supports the conclusion that she passed out on the living room floor and stayed there most of the evening, not moving away from the pool of her own vomit or when defendant videotaped her or took a photo of her without underwear or pants on. G. testified that even after being dropped off at a different apartment complex, T. was unable to walk; she kept falling over and at one point was on the ground, vomiting. D. also saw T. passed out, face down in the grass. Mason also saw one of the girls, likely T., lying on the ground. Indeed, T.'s blood alcohol level was still high, 0.27 percent, when she arrived at the hospital hours later. She testified that she did not remember having sex that night. From these circumstances, the inevitable conclusion was that if intercourse took place, it was extremely likely it was when she was too intoxicated to resist and/or unconscious.

Defendant attempts to characterize this case as involving "DNA only," arguing that a conviction hinging on a single piece of evidence with more than one credible explanation should not stand. This concern was raised in the "fingerprint only" cases upon which defendant relies for this point. (See, e.g., *Mikes v. Borg* (9th Cir. 1991) 947 F.2d 353; *Birt v. Superior Court* (1973) 34 Cal.App.3d 934.) In these cases, the prosecution's evidence rested exclusively on the presence of the defendant's fingerprints

22

on a moveable object or an area to which the public had access.  (See also *People v. Flores* (1943) 58 Cal.App.2d 764 [evidence of a single fingerprint on the rear view mirror of a stolen car insufficient to prove grand theft]; *People v. Trevino* (1985) 39 Cal.3d 667, 696-697 [because the defendant was the victim's friend, his fingerprints at the victim's house did not solidly link the defendant to the scene of the murder on the day of the murder], disapproved on other grounds in *People v. Johnson* (1989) 47 Cal.3d 1194, 1219; but see *People v. Johnson* (2019) 8 Cal.5th 475, 515-516 [evidence of a fresh fingerprint found on a gun clip inside a gun was sufficient to establish the defendant used the gun to attack victim].)  The instant case is easily distinguishable as there is more than just the DNA evidence establishing defendant's guilt for raping T., and we conclude substantial evidence supports defendant's convictions as to T.

> 2. *Rape of Intoxicated D.*

As to D. and G., defendant claims there was insufficient evidence to support his convictions for raping them while they were too intoxicated to resist, essentially because it was not credible that D. and G. blacked out during the events and even if they did, they interacted with him in such a way that he reasonably believed they were capable of consenting to sexual intercourse.  Again, we do not reevaluate the credibility of witnesses or resolve factual conflicts; rather, we presume the existence of every fact in support of the verdict that reasonably could be inferred from the evidence.  (*People v. Brady, supra*, 50 Cal.4th at p. 564.)  From this perspective, we conclude substantial evidence supports defendant's convictions as to D. and G.

Defendant emphasizes that D. had an opportunity to tell him to stop but did not do so.  He argues that her admission that she could have said something, proves her intoxication did not prevent her from resisting—a necessary element of Penal Code section 261, subdivision (a)(3).  He contends that D. knew she was having sex, could have asked him to stop, but instead said she "didn't want to."

23

Defendant's fixation on the point in time where D. could have resisted presents too narrow a view of the evidence. Defendant's account of having sex with D. did not include discussion, invitation, or consent. Rather, he testified that "[a]t some point, it went from me having sex with [G.] to me having sex with [D.]" D. testified that happened after she was forcibly assaulted in the bathroom, could not walk straight to the bedroom, was thrown on the bed by Gonzalez, and blacked out. When she regained awareness of the situation, she saw defendant's face as he was having sex with her. D. testified she was scared and just wanted it to be over so she could leave. While D. did not object once she regained awareness, defendant had already engaged in sexual activity with her at a time when she was too intoxicated to resist.

We need not simply take D.'s word for her level of intoxication; G. testified that by the time they were dropped off at the apartment complex, D. was still falling over and needed help walking. Before calling 911 on the girls' behalf, Mason also perceived all the girls to be "either on something or drunk" and saw one girl, likely D., "holding her legs and rocking." Given D.'s inability to walk unassisted at the point of departure, defendant reasonably should have known that the effect of the intoxication prevented D. from resisting earlier in the evening. (See Pen. Code, § 261, subd. (a)(3).) Indeed, it is reasonable to infer that because she was so drunk, D. left the apartment without her underwear, shoes, purse or phone.

### 3. *Rape of Intoxicated G.*

G. also testified that she drank 10 shots of alcohol. She was heavily intoxicated and blacked out for most of the time she spent at the apartment. She did not remember any of the sexual activity. Defendant contends that G. engaged in "much more active sexual relations" with him than D. and references that D. described G. as " 'pretty much bouncing on him.' " Contrary to defendant's claim, the fact that the sexual encounter was not the type of "passive, uncaring, sex" described in the factually distinguishable

cases[6] he relies on, does not undermine the factual foundation for his conviction as to G. (See Pen. Code, § 261, subd. (a)(3); CALCRIM No. 1002; *People v. Giardino* (2000) 82 Cal.App.4th 454, 460 ["if the victim is so unsound of mind that he or she is incapable of giving legal consent, the fact that he or she may have given actual consent does not prevent a conviction of rape"]; *id.* at p. 471 ["the actual consent of the victim is not a defense to a charge of rape by intoxication, a belief in the existence of such actual consent is irrelevant"]; cf. *People v. Dancy* (2002) 102 Cal.App.4th 21, 36 [as to rape of an unconscious person who cannot resist, consent (or even belief in advance consent) is irrelevant if the defendant knows the victim is unconscious].)  Indeed, according to the forensic toxicologist, a person's other functions may still be working while they are experiencing a blackout, but signs of impairment would be expected.  These signs were present as D. described G. during the sexual activity as "really drunk" and "sloppy, out of it, talking, really slurring her words."  G. was still drunk when she left the apartment; so drunk, she left without her shoes, purse, and cell phone.  When Mason encountered the girls, she thought they all appeared intoxicated and said the girl who approached her, likely G., could "barely talk.  She was slurring her words, and she seemed like she could barely stand up."  Under these circumstances, defendant's belief that G. was not too intoxicated to give legal consent to sexual intercourse was not reasonable.  (Pen. Code, § 261, subd. (a)(3); CALCRIM No. 1002 [a reasonable but mistaken belief that a sexual partner is not too intoxicated to give legal consent to sexual intercourse is a defense to rape by intoxication].)

---

[6]     See *People v. Ing* (1967) 65 Cal.2d 603, 607 (the defendant administered an intoxicating narcotic or anesthetic substance that prevented the victim from resisting); *People v. Wojahn* (1959) 169 Cal.App.2d 135, 139 (the defendant injected the victim with a drug prior to engaging in sexual intercourse with her); *People v. Crosby* (1911) 17 Cal.App. 518, 524-526 (sufficient evidence of rape by intoxication but prosecutorial misconduct resulted in a miscarriage of justice).

*A. Additional Background*

At the prosecution's request, the trial court admitted testimony from a young woman, B., who previously accused codefendant Gonzalez of raping her while she was intoxicated and unconscious. B. testified that in January 2016, she did not really know Gonzalez, but interacted with him at a holiday work party. Gonzalez appeared to be drunk, and lifted her off the ground in a bear hug, while trying to kiss her. She later left the party and went to a bar with some friends; Gonzalez was not with her. B. said she had one shot of liquor at the bar, and the next thing she remembered was waking up in Gonzalez's bed, naked. Gonzalez was having sex with her and would not stop despite her repeated requests to do so. B.'s next memory was waking up the next day. She was completely naked and did not have her phone or a way to get home. She ordered an Uber from Gonzalez's phone, went home, and took a shower. Days later, she reported the incident to the police.

B.'s testimony was offered for the purpose of proving Gonzalez's propensity to commit such offenses (see Evid. Code, § 1108) and that he had a motive to commit the charged offenses against the victims in this case, operated pursuant to a similar plan or scheme, and did not commit the present crimes by mistake or accident (see Evid. Code, § 1101, subd. (b)). Consistent with this ruling, the prosecutor argued during closing argument that if the jury believed B.'s account of her encounter with Gonzalez, it showed that he had the propensity and a plan to commit the crimes against D., T., and G.

The jury was specifically instructed with CALCRIM No. 1191, regarding evidence that Gonzalez committed the crime of rape of an intoxicated woman and rape of an unconscious woman against B. The jury was instructed that if the People had proved by a preponderance of the evidence that the defendant (Gonzalez) committed the uncharged offenses, the jury may but was not required to consider it as evidence that defendant

(Gonzalez) had a propensity to commit sex offenses. The instruction was modified to include: "You have heard evidence regarding [B.] As it relates to defendant Robertson this evidence is not to be and must not be considered for any other reason."

The jury was also instructed with CALCRIM No. 375, modified to specifically refer to Gonzalez. The jury was instructed that it was permitted, but not required, to consider this evidence for the limited purpose of determining (1) whether Gonzalez "knew that the effect of an intoxicating substance prevented the woman from resisting when he allegedly acted in this case," (2) whether Gonzalez's "alleged actions were not the result of mistake or accident," and (3) whether Gonzalez "had a plan to commit the offenses alleged in this case." It also instructed the jury, "Do not consider this evidence for any other purpose except for the limited purpose of knowledge, accident or a common plan."

*B. Analysis*

Defendant argues that use of the word "plan" in CALCRIM No. 375 inherently implicates two or more people and, because the assaults took place at defendant's apartment, the modified instruction "would have suggested that [defendant] must have been involved in any 'plan' by Gonzalez . . . ." Thus, he contends the trial court should have added language making it clear that the instruction only applied to Gonzalez. He argues the modified instruction provided a permissive inference that defendant shared Gonzalez's plan to commit the offenses. We disagree.[7]

The question presented by these contentions "is whether there is a 'reasonable likelihood' that the jury understood the charge as the defendant asserts." (*People v. Kelly* (1992) 1 Cal.4th 495, 525.) In making that determination, we consider the language of

---

[7] Because we address the merits of the claim, we need not address defendant's related argument that counsel was ineffective for failing to preserve the issue in the manner raised on appeal.

27

the instruction at issue, the instructions as a whole, and the arguments of counsel. (*Id.* at pp. 525-526.) "Jury instructions that create a permissive inference, even if erroneous, are unconstitutional only if the inference is irrational." (*People v. Parker* (2022) 13 Cal.5th 1, 66.)

Here, CALCRIM No. 375 worked in tandem with CALCRIM No. 1191; where the application of both were exclusively limited to Gonzalez. As noted, CALCRIM No. 1191 specifically stated, in part, "You have heard evidence regarding [B.] As it relates to defendant Robertson this evidence is not to be and must not be considered for any other reason." Similarly, CALCRIM No. 375 instructed the jury how it could consider the evidence of the prior acts as to *Gonzalez only.* Because CALCRIM No. 1191 specifically told the jury it could not consider the prior act evidence as to defendant for any reason, the jury could not consider that evidence in utilizing CALCRIM No. 375's instruction regarding proof of Gonzalez's plan. Because the language of CALCRIM No. 375 only specifically referred to Gonzalez, there was no invitation for the jury to deviate from the limitation as stated in CALCRIM No. 1191. We conclude the language of the instructions sufficiently limited the instruction to apply only to Gonzalez such that no permissive inference was created.

As applied to Gonzalez, CALCRIM No. 375 accurately conveyed the law. Indeed, a different panel of this court recently found no abuse of discretion or due process error in admitting evidence regarding B. for propensity purposes or as evidence of Gonzalez's plan, and no error in providing the modified CALCRIM No. 375 instruction. (See *People v. Gonzalez, supra*, C094199.) Because the jury instructions were limited to Gonzalez, we are unpersuaded that the jury misunderstood or misused CALCRIM No. 375 to improperly convict defendant. We presume the jurors understood and followed the court's instructions (*People v. Brady, supra*, 50 Cal.4th at p. 566, fn. 9), and there is nothing in the record to rebut this presumption. During closing arguments, the prosecutor confined her arguments regarding B. as evidence of Gonzalez's propensity and plan to

commit the sex offenses on the girls and none of the notes the jury sent during deliberation pertained to instructions or evidence regarding B.  We conclude defendant's claim of constitutional error is meritless.

## DISPOSITION

The judgment is affirmed.


        /s/
EARL, J.


We concur:


        /s/
ROBIE, Acting P. J.


        /s/
McAdam, J.*

---

\*      Judge of the Yolo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.